IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| **PROJECT VOTE, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| v. | ) | |
| | ) | |
| **BRIAN KEMP,** | ) | **COMPLAINT FOR** |
| *In His Official Capacity as Georgia* | ) | **DECLARATORY AND** |
| *Secretary of State and Chief Election* | ) | **INJUNCTIVE RELIEF** |
| *Official for the State of Georgia,* | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>COMPLAINT</u>

Plaintiff Project Vote, Inc. ("Project Vote" or "Plaintiff"), by and through its

undersigned attorneys, brings this lawsuit against Defendant Secretary of State

Brian Kemp ("Secretary Kemp" or "Defendant") and hereby alleges as follows:

1.     Project Vote is a national, non-partisan organization dedicated to

increasing voter participation.  To accomplish that goal, Project Vote relies on

public election records and good faith dialogue with state election officials to

ensure that voter registration applicants are properly added to the voter rolls and

that voters are not improperly purged.  Critical to these efforts is the public

disclosure of records concerning the programs and activities used by state election officials to verify the accuracy and currency of official lists of eligible voters, as mandated by the National Voter Registration Act of 1993 ("NVRA").

2.      Prior to the 2014 United States midterm elections, Project Vote requested that Defendant make publicly available, as required by the NVRA, certain records concerning Defendant's processes and reasons for rejecting, canceling, or otherwise not adding voter registration applicants to Georgia's official list of eligible voters (the "voter roll").  Project Vote requested these records in light of concerns that Defendant had improperly rejected, canceled, or failed to add a large number of applicants to the voter roll.

3.      Project Vote's concerns regarding Defendant's compliance with the NVRA are well-founded.  In April 2015, media sources reported that Defendant's Elections Director Linda Ford resigned after illegally changing the status of almost 8,000 voters from inactive to canceled within 90 days before a federal election, in direct violation of the express requirements of the NVRA.

4.      More than two years after its initial request, and with a critically important presidential election looming, Project Vote *still* has not received all of the records it requested and to which it is entitled under the NVRA.  Although Defendant provided access to incomplete records beginning in October 2014, he

refuses to make available records that sufficiently explain *why* applicants were rejected, canceled, or otherwise not added to the voter roll.

5.     Without an explanation for Defendant's decision to reject, cancel, or not add a particular voter registration applicant, Project Vote is unable to perform the critical public oversight functions envisioned by the NVRA or ensure that Defendant is not using arbitrary or otherwise improper criteria for rejecting applicants or purging voters.  Further, it is unable to educate Georgia voters and applicants on how to complete applications and remain on the rolls or educate other voter registration organizations to assist these voters and applicants.  Absent timely relief, Project Vote will not be able to do so in time for the impending elections.

## NATURE OF THE CASE

6.     Project Vote brings this lawsuit to challenge Defendant's refusal to make records concerning voter registration applications that were rejected, canceled, or otherwise not added to the voter roll available for public inspection as required by the National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq.*

7.     Specifically, Project Vote requests that the Court order Defendant to promptly make available for public inspection the following records (collectively,

the "Requested Records"):

A.  All records relating to voter registration applications that Defendant rejected, canceled, or otherwise did not add to the voter roll (*e.g.*, applicants who are pending verification) since July 6, 2013, including all records relating to the specific reason an applicant was rejected, canceled, or otherwise not added to the voter roll.

B.  Defendant's disclosure must include, but should not be limited to, the following:

i.  Records reflecting whether a voter registration applicant was rejected, canceled, or otherwise not added to the voter roll because of a non-match with information in the Georgia Department of Driver Services ("DDS") database or a non-match with information in the Social Security Administration ("SSA") database, and if so, which data field(s) resulted in the non-match.

ii.  Records sufficiently explaining the specific reason an applicant was rejected, canceled, or otherwise not added to the voter roll, including records sufficiently explaining the meaning of any abbreviations or codes used to represent such reasons in Defendant's disclosure;  and

iii.  Records reflecting the algorithm or criteria by which information in a voter registration application is determined to match or not match information in the Georgia DDS or SSA databases.

8.  Upon information and belief, all of the Requested Records exist in Georgia's voter registration database or elsewhere, and all of the Requested Records are within Defendant's possession, custody, and control.

9.  Project Vote seeks to inspect the Requested Records to ensure that Georgia is properly processing voter registration applications, including its process

for verifying personal identifying information submitted on voter registration applications as part of determining whether a voter registration applicant should be added to its voter roll.  Georgia's verification programs and activities include processes for rejecting new applicants based on mismatches between the information contained in their applications (as entered into the voter registration database by Georgia election officials) and the corresponding information contained in the Georgia DDS database or the national SSA database.  Project Vote requested these records to confirm that this verification and matching process is being carried out properly and to ensure that voter registration applicants are not being rejected due to administrative or clerical errors that should have been corrected by Defendant or otherwise subjected to appropriate quality control procedures.

10.    Project Vote first requested records in May 2014.  As described below, Defendant provided access to an incomplete list of rejected applicants in October of 2014.  Since then, Defendant has only provided access to similarly incomplete records that are missing the critical information Project Vote requires to exercise the oversight functions contemplated by the NVRA.

11.    Over the last two years, Project Vote engaged in drawn-out negotiations with Defendant to obtain the Requested Records while attempting to

minimize any burden on Defendant in complying with its obligations under the

NVRA.  Despite Project Vote's good faith efforts to narrow and amend its record

requests, the negotiations have reached an impasse.

12.    Defendant continues to refuse to make the Requested Records

available for public inspection, in violation of the NVRA.  The statute requires

Defendant to make available "*all* records concerning the implementation of

programs and activities conducted for the purpose of ensuring the accuracy and

currency of official lists of eligible voters."  52 U.S.C. § 20507(i)(1) (emphasis

added).

13.    Defendant's unlawful refusal to make the Requested Records

available for public inspection prevents Project Vote from performing its critical

voter registration oversight functions.  As a result, Defendant has escaped the

oversight mandated by the NVRA.  Specifically, upon information and belief,

Defendant has rejected, canceled, or not added to the voter roll a large number of

voter registration applicants.  Without the Requested Records, Project Vote cannot

determine the justification for the rejections, including whether they were based on

administrative errors in Defendant's applicant verification process or Defendant's

failure to properly implement quality control procedures to correct those errors.

Defendant's refusal to make the Requested Records available has thus undermined

the NVRA's stated purposes to "increase the number of eligible citizens who register to vote" in federal elections, "enhance the participation of eligible citizens as voters," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b); *see also id.* § 20507(i)(1).

14.    Defendant's refusal to make the Requested Records available to Project Vote prior to the 2014 United States midterm elections prevented Project Vote from assisting and educating applicants who were rejected or canceled with registering to vote in time for those elections, and prevented Project Vote from educating other voter registration organizations to assist those applicants. Defendant's continued failure to provide Project Vote with access to the Requested Records threatens to again prevent Project Vote from assisting rejected, canceled, or not added applicants with registering to vote in time for future elections, including the fast-approaching 2016 United States general elections.

15.    Project Vote therefore seeks equitable and declaratory relief from this Court to ensure that Defendant fulfills his obligations under federal law to make the Requested Records available to Project Vote free of cost.  Project Vote intends to seek preliminary relief so that it may obtain that relief in a timely manner prior to the upcoming 2016 general elections.

## JURISDICTION AND VENUE

16.    This action is brought pursuant to 52 U.S.C. § 20510(b) to redress the

deprivation, under color of state law, of rights secured by federal statute.

17.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  It may issue

a declaratory judgment and provide for further relief pursuant to 28 U.S.C. §§ 2201

and 2202.

18.    Venue lies in this District and Division pursuant to 28 U.S.C. § 1391.

19.    An actual and justiciable controversy exists between Plaintiff and

Defendant.

## PARTIES

20.    Plaintiff Project Vote is a nonprofit 501(c)(3) charitable organization

existing under the laws of Louisiana, with its principal office in the District of

Columbia.  Project Vote's mission is to build an electorate that accurately

represents the diversity of America's citizenry and to ensure that every eligible

citizen can register, vote, and cast a ballot that counts.  To further this goal, Project

Vote engages in various voter registration programs, including conducting and

assisting with voter registration drives and educating eligible citizens and other

voter registration organizations on states' voter registration procedures.  To verify

that eligible voter registration applicants are properly added to the voter rolls and

that eligible voters are not unlawfully removed, Project Vote requests and uses

public voter registration records maintained by state and county officials.  Regular

access to updated voter registration records is crucial to reviewing the integrity and

accuracy of the voter rolls.

21.    Defendant Brian Kemp is sued in his official capacity as Georgia

Secretary of State.  Under Georgia law, Defendant's responsibilities include

maintaining the state's official list of registered voters and preparing and

furnishing information for citizens on voter registration and voting.  Ga. Code Ann.

§§ 21-2-50(a), 21-2-211.  Defendant also serves as the Chairperson of Georgia's

State Election Board, *id.* § 21-2-30(d), which promulgates and enforces rules and

regulations to (i) obtain uniformity in the practices and proceedings of election

officials as well as legality and purity in all primaries and elections, and (ii) be

conducive to the fair, legal, and orderly conduct of primaries and elections, *id.*

§§ 21-2-31, 21-2-33.1.  Finally, Defendant is the chief election official responsible

for the coordination of Georgia's responsibilities under the NVRA.  *Id.* § 21-2-210

("The Secretary of State is designated as the chief state election official to

coordinate the responsibilities of this state under the National Voter Registration

Act of 1993 (P.L. 103-31) as required by 42 U.S.C. Section 1973gg-8 [transferred

to 52 U.S.C. § 20509].").

## FEDERAL STATUTORY BACKGROUND

22.     Congress enacted the NVRA in 1993 to, *inter alia*, protect the integrity of the electoral process by better securing citizens' fundamental rights to vote with improved voter registration procedures.  Pub. L. No. 103-31, 107 Stat. 77 (1993) (codified at 52 U.S.C. § 20501 *et seq*.).  In so doing, Congress sought to remedy "discriminatory and unfair registration laws and procedures" that have "direct and damaging" effects on voter participation in federal elections and disproportionately harm voter participation among racial minorities.  52 U.S.C. § 20501(a)(3).  To this end, the NVRA imposes a variety of requirements on states concerning voter registration procedures and policies.  *Id.* § 20507.

23.     A primary goal of the NVRA is to "ensure that accurate and current voter registration rolls are maintained."  *Id.* § 20501(b)(4).  Accurate and up-to-date voter rolls are critically important to guaranteeing that eligible voters are afforded the right to vote.

24.     To accomplish that goal, Section 8(i) of the NVRA requires states to make voter registration records publicly available for inspection and copying:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purposes of ensuring the accuracy and currency of official lists of eligible voters . . . .

-10-

*Id.* § 20507(i)(1) (the "Public Disclosure Provision").

25.     The Public Disclosure Provision is essential to the NVRA's purpose of ensuring effective, accurate, and non-discriminatory voter registration practices because it allows the public to confirm that states are abiding by the federal legislation.  *See id.* § 20501(b).  The stated purposes of the legislation include to "increase the number of eligible citizens who register to vote" in federal elections, "enhance[] the participation of eligible citizens as voters," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained."  *Id.*

26.     The Requested Records concern the "implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  Georgia officials are therefore obligated to make these records available "for public inspection."  *Id.* § 20507(i)(1).

## FACTUAL ALLEGATIONS

27.     As described below, Project Vote has not received all of the Requested Records, despite requesting them beginning in 2014 and engaging in protracted negotiations with Defendant to obtain them.  Defendant has only provided incomplete records in a piecemeal fashion, after significant and unnecessary delays.  In July 2015, Project Vote notified Defendant that his failure

to provide these records violated the Public Disclosure Provision of the NVRA. Between this initial notification and May 2016, Project Vote worked diligently and in good faith to negotiate with Defendant to obtain sufficient information to satisfy its requests. Despite repeated promises and repeated delays, and despite Project Vote's notification that his conduct was in contravention of the NVRA's requirements, Defendant has continued his noncompliance.

### A.   Georgia's Voter Registration Procedures

28.    Georgia election officials maintain the state's voter registration information in an electronic database known as the Georgia Voter Registration System ("GVRS").

29.    Once a voter registration application is received, Georgia election officials enter the information contained in the application into GVRS.

30.    Before adding an applicant's name to the official list of voters, however, Georgia election officials must first determine that an applicant is eligible. *See* Ga. Code Ann. §§ 21-2-223(a), 21-2-226(a). Part of Defendant's eligibility determination is a verification process established by Defendant pursuant to the Help America Vote Act, 42 U.S.C. § 15483(a)(5) (2012) (transferred to 52 U.S.C. § 21083). That process verifies an applicant's Georgia driver's license number, Georgia identification card number, or the last four digits

of the applicant's Social Security number ("SSN"), at least one of which must be

provided on a voter registration application, with the information contained in the

Georgia DDS or SSA databases. *See* "Process for Entering New Voter

Registration Application Information into the Statewide Voter Registration

System" at 1, State of Georgia Submission Under Section 5 of the Voting Rights

Act (Aug. 17, 2010), attached to Ference-Burke Decl.[1] as <u>Exhibit A</u>.

31. The State of Georgia, in a submission to the U.S. Department of

Justice, has described the verification process as follows: After an application is

entered into GVRS, the information is transmitted to the Georgia DDS for

verification. *Id.* If an applicant provided a Georgia driver's license number or

state identification card number on his or her application ("Driver's License/ID

Card Applicants"), DDS verifies the following information on the application with

information in its database: first name, last name, date of birth, driver's

license/identification card number, last four digits of SSN, and United States

citizenship information. *Id.* at 1-2. DDS then sends the results of the verification

back to GVRS. *Id.* at 1. If an applicant only provided the last four digits of his or

her SSN ("SSN-Only Applicants"), SSA verifies the following information on the

---

[1] References to the Ference-Burke Declaration and exhibits are to the Declaration of Jonathan R. Ference-Burke in Support of Project Vote's Complaint for Declaratory and Injunctive Relief, filed concurrently herewith.

application with information from the SSA database: first name, last name, date of birth, and last four digits of SSN.  *Id.* at 2.

32.     Only if the information provided on an application "matches" DDS or SSA records will the applicant become an active registered voter in the GVRS database.  *Id.* at 2.  For Driver's License/ID Card Applicants, the information must "exactly" match.  *Id.*  SSN-Only Applicants are considered "not verified" if the SSA database returns a response code for "INVALID INPUT," "MULTIPLE MATCHES – ALL DECEASED," "SINGLE MATCH DECEASED," or "NO MATCH FOUND."  *Id.* at 2-3.  If the information does not "match" DDS or SSA records, the application will be deemed incomplete as to the information not verified.  *Id.* at 4.

33.     Each day, Defendant creates two reports identifying applicants who resulted in a non-match and the specific information that could not be verified.  *Id.* at 2.  The first report – the "SSVRZ791R1" report (the "R1 Report") – displays the specific information which could not be verified with an "N" next to it and the information that was verified with a "Y" next to it.  *Id.* at 3.  The second report – the "SSVRZ791R2" report (the "R2 Report") – displays voter registration applicants whose citizenship information could not be verified by DDS.  *Id.*  The R2 Report notes any identifying information that could not be verified, and also

includes a "Citizen" column noting that the applicant "self-reported to DDS that he or she is not a citizen of the United States." *Id.* Georgia election officials are advised to review both reports on a daily basis. *Id.*

34.    "Non-match" applicants must be notified in writing of the specific information that resulted in the non-match and given an opportunity to correct the information. *See* Ga. Code Ann. § 21-2-220(d); Exhibit A at 4. Georgia election officials must indicate in GVRS that a notice has been mailed. Exhibit A at 4. Prior to notifying the applicant, however, the officials must check the application for processing or data entry errors, and if they find such errors, must correct them and re-run the application through the verification process. *See id.*

35.    If "non-match" applicants do not respond to the notice within 30 days, they are rejected. *See* Ga. Code Ann. § 21-2-220(d); Exhibit A at 4. If "non-match" applicants respond with the requested information within 30 days, Georgia election officials enter the information into GVRS and the application is resubmitted to DDS for verification. Exhibit A at 4.

36.    The R1 and R2 Reports generated by Defendant, as well as the individual notices sent to voter registration applicants who were not verified, demonstrate that Defendant is in possession, custody, or control of Requested Records relating to the specific reason an applicant was rejected or otherwise not

added to the voter roll.

37.    The substantial number of applicants that, on information and belief, have been rejected, canceled, or otherwise not added to the voter roll, suggest that these rejections may be due to one or more of the following: processing or data entry errors in the verification process described above, failure to implement quality control measures to identify and cure processing or data entry errors in the verification process, failure to properly and timely send notices to applicants whose applications result in a non-match, or failure to properly and timely resolve applicants' responses to such notices.  However, without inspecting the Requested Records, Project Vote cannot adequately evaluate Defendant's voter registration procedures, and specifically its verification process, and therefore cannot advocate for a change or determine whether violations of the law have occurred.

**B.    Project Vote's Requests for Records Under the NVRA**

38.    In early 2014, Project Vote began receiving reports from multiple sources that some voters in Georgia were being asked for documentary proof of United States citizenship.

39.    On May 13, 2014, to determine if Georgia was enforcing proof of citizenship laws, *see* Ga. Code Ann. § 21-2-220(b), and as a result rejecting voter registration applications or requiring additional documentation from registrants

when voting, Project Vote sent a letter to Defendant requesting that he make

available for inspection and copying pursuant to the NVRA the following

(collectively, the "May 13, 2014 Records Requests"):

(1)     Records related to voter registration applicants not added to the official list of eligible voters, or flagged as requiring additional documents before voting with a regular ballot, because the applicant had not submitted satisfactory proof of citizenship pursuant to Ga. Code Ann. § 21-2-220(b) and Ga. Comp. R. & Regs. 183-1-6-.06 and 590-8-1-.02;

(2)     For each such record, certain data related to the voter registration applicant and his or her registration status, including, but not limited to the applicant's current registration status (*i.e.*, approved, rejected, pending, flagged), whether the applicant had received any notices regarding his or her registration status, whether the applicant had responded to any such notices, etc.;[2]

(3)     Records describing or defining any data codes used in the records requested in (1); and

(4)     Policies, manuals, or other guidance provided to Defendant's staff, contractors, or local election officials regarding the processing of

---

[2]     The complete list of data requested is as follows: First Name; Last Name; Middle Name; Suffix; Street Number and Address; Apartment Number; City; State; Zip Code; Phone Number (including area code); Date of Birth; Race; Voter Identification Number; Date Application Signed by Applicant; Date Application Received by Election Officials; and all records relating to processing of the application, including date application was processed or entered into database; current status, such as whether applicant's record is flagged for proof of citizenship (*i.e.*, approved, rejected, pending, flagged); date status changed, if at all; history of any change in status, if any; types of letters or notices mailed, if any; dates letters or notices mailed, if at all; status of letter or notice, *i.e.*, whether it was returned; and any response to notice or letter.

> voter registration applications and preparation of the voter rolls as
> they relate to the requirement to provide satisfactory proof of
> citizenship, including but not limited to manuals provided to election
> workers to instruct them on how to process applicants whose records
> are flagged for lack of proof of citizenship.

Letter from Brian Mellor, General Counsel, Project Vote, to Secretary Kemp (May

13, 2014), attached to Ference-Burke Decl. as <u>Exhibit B</u>.

40.     By letter dated July 11, 2014, C. Ryan Germany, General Counsel for

the Office of the Georgia Secretary of State, acknowledged receipt of Project

Vote's May 13, 2014 Records Requests.  He requested payment from Project Vote

in the amount of $750 and estimated that it would take approximately two weeks to

fulfill the requests.  Letter from Germany to Mellor (July 11, 2014), attached to

Ference-Burke Decl. as <u>Exhibit C</u>.

41.     On September 18, 2014, in response to Germany's request for

payment, Project Vote sent Defendant a check for $750, expressly reserving its

right to seek reimbursement of the payment under the NVRA.  Letter from

Michelle Kanter Cohen, Counsel, Project Vote, to Germany (Sept. 18, 2014),

attached to Ference-Burke Decl. as <u>Exhibit D</u>. [3]

---

[3]     On August 15, 2014, Project Vote also sent Defendant a check for $500 for
access to a statewide registered voter list.  It had requested the list from the
Georgia Secretary of State Elections Division on June 3, 2014, but had been
informed by Germany that its request would not be processed until it made
payment.  Project Vote reserved its right to seek reimbursement of the payment

42.     As of September 24, 2014, Project Vote had not received any records in response to its May 13, 2014 Records Requests.

43.     By letter dated September 24, 2014, Mellor notified Defendant that he had violated the NVRA by requiring Project Vote to pay $750 to inspect the records requested in the May 13, 2014 Records Requests, and by failing to make those records available to Project Vote.  Letter from Mellor to Secretary Kemp (Sept. 24, 2014), attached to Ference-Burke Decl. as Exhibit E.  Mellor reminded Defendant that it was "imperative that we are able to review these and any other necessary records in light of the impending 2014 midterm elections," and requested a reply within 15 days to "ensure that we have sufficient time to resolve these issues before the 2014 midterm elections."  *Id.*

44.     By September 2014, Project Vote became concerned that large numbers of qualified voter registration applicants were not being added to Georgia's voter roll.  It sought to determine why these applicants were not being added and to assist the applicants with correcting any errors in their applications and completing registration in time to vote in the 2014 midterm elections.

45.     By phone on September 24, 2014, Mellor revised Project Vote's May

---

under the NVRA.  On August 29, 2014, Project Vote received an electronic copy of the list, along with a receipt for its payment.  On or about October 15, 2014, Project Vote received another electronic copy.

13, 2014 Records Requests, requesting that Defendant make available for

inspection and copying pursuant to the NVRA the following (collectively, the

"September 24, 2014 Records Requests"):

> (1)  Records related to *all* voter registration applicants who were rejected or otherwise not added to the voter roll, including but not limited to those not added to the roll for lack of satisfactory proof of citizenship;

> (2)  For each such record, the same data related to the voter registration applicant and his or her registration status as the data requested in the May 13, 2014 Records Requests;

> (3)  Records describing or defining any data codes used in the records requested in (1); and

> (4)  The same policies, manuals, or other guidance requested in the May 13, 2014 Records Requests, plus any material provided to primary and election officials pursuant to Ga. Code Ann. § 21-2-31 in 2012, 2013, and 2014.

*See* Email from Mellor to Germany (Sept. 25, 2014), attached to Ference-Burke

Decl. as <u>Exhibit F</u>.

46.    Germany agreed to provide records satisfying Project Vote's May 13,

2014 and September 24, 2014 Records Requests, and estimated that he could do so

in no more than two weeks.  *See* <u>Exhibit F</u>.

47.    On September 29, 2014, Germany informed Mellor that his office had

destroyed Project Vote's $750 check submitted for the May 13, 2014 Records

Requests.  Emails between Germany and Mellor (Sept. 29, 2014), attached to

Ference-Burke Decl. as <u>Exhibit G</u>.

48.     On October 6, 2014, voter registration for the 2014 United States midterm elections ended in Georgia.

49.     On October 9 and again on October 14, 2014, Mellor emailed Germany to inquire about the status of Project Vote's May 13, 2014 and September 24, 2014 Records Requests.  Emails between Mellor and Germany (Oct. 9, 2014), attached to Ference-Burke Decl. as <u>Exhibit H</u>; Emails between Mellor and Germany (Oct. 14, 2014), attached to Ference-Burke Decl. as <u>Exhibit I</u>.

50.     On October 13, 2014, early voting for the 2014 United States midterm elections began in Georgia.

**C.     Defendant's Failure to Provide the Requested Records in Violation of the NVRA**

51.     Defendant did not provide any records responsive to Project Vote's May 13, 2014 or September 24, 2014 Records Requests until October 14, 2014, approximately one week after the voter registration deadline for the 2014 United States midterm elections and approximately five months after Project Vote's initial May 13, 2014 Records Requests.

52.     On October 14, 2014, Germany emailed Mellor an "NVF" ("non-verify") report, which purportedly contained a "list of applicants that were not placed on the rolls due to a non-match with DDS or SSA records, including a

citizenship non-match" (the "NVF Report").  Exhibit I.  The report included approximately 14,000 applicants.

53.    On October 15, 2014, Mellor notified Germany that the NVF Report did not satisfy Project Vote's requests.  He explained that the Report did not include all applicants not added to the voter roll for any reason because it only included applicants not added due to "NVF" status, which appeared to be a subset of rejected applicants.  Further, it did not identify "which, if any, of the applicants were rejected because of citizenship, and which were rejected due to a non-match with DDS or SSA records," and it did not define the codes used within it.[4]  Emails between Mellor and Germany (Oct. 15, 2014 to Oct. 17, 2014), attached to Ference-Burke Decl. as Exhibit J.  Two days later, Germany responded that "NVF" encompassed all rejected applicants and indicated that he would "get [Project Vote] definitions for codes" as well as "see if I get more detail as to why they did not verify."

54.    On October 15, 2014, Project Vote received an incomplete set of training materials from Defendant.

55.    On October 30, 2014, Ryan Malone of Ropes & Gray LLP, counsel to

---

[4]    For all voters included, "Voter_Status" was "C" and "Status_Reason" was "NVF," with no explanation of the meaning of either.

Project Vote, emailed Germany to inquire about the missing records, as discussed

with Germany on a phone call the prior week.  To make sure Project Vote received

complete information necessary to assess Georgia's voter registration procedures,

Malone revised Project Vote's requests to include records related to all "canceled"

voters.[5]  Further, he reiterated Project Vote's requests for data indicating the

reasons for individuals' rejections or cancelations, including whether individuals

not added to the voter roll used a driver's license number or SSN[6] (the "DDS/SSN

Data," and together with other data requested, the "Requested Data").  To further

ensure that Project Vote received adequate data and information explaining these

reasons, Malone also requested the complete database file underlying the records

of applicants not added to the voter roll, as well as "[i]nstructions provided to

programmers or other staff on how to construct the DDS and SSN matches with

GVRS as currently used, including the algorithm to conduct the match" (together

with the May 13, 2014 and September 24, 2014 Records Requests, the "Records

---

[5]      In the course of its exchanges with Defendant, Project Vote learned that some voters not added to the voter roll could be characterized as "canceled."  This understanding was later confirmed by Germany in 2015.  *See* Letter from Germany to Jonathan Ference-Burke, Ropes & Gray LLP (Aug. 25, 2015), attached to Ference-Burke Decl. as <u>Exhibit M</u> (acknowledging that applicants rejected due to felon status were categorized as "canceled" voters and not included in NVF Report).

[6]      Project Vote did not request the numbers themselves.

Requests"). Malone also clarified that Project Vote's previous requests for policies, manuals, and other guidance included the GVRS "User Guide" and the GVRS Manual (to the extent a different document). Emails between Malone and Germany (Oct. 30, 2014 to Apr. 3, 2015), attached to Ference-Burke Decl. as Exhibit K.

56.     On November 2, 2014, early voting for the 2014 United States midterm elections ended in Georgia.

57.     On November 4, 2014, Georgia held the 2014 United States midterm elections. This date was also Georgia's deadline for returning regular absentee ballots by mail, as well as Georgia's deadline for postmarking military and overseas ballots sent by mail from outside of the United States.

58.     Defendant failed to satisfy Project Vote's Records Requests before any of Georgia's deadlines for the 2014 United States midterm elections. As a result, Project Vote was unable to timely identify all voter registration applicants who had not been added to the voter roll or to assist those applicants with completing their registrations in time to vote in those elections. Project Vote was also unable to determine whether applicants were being lawfully rejected or otherwise not added to the voter roll.

59.     Despite Defendant's failure to provide records prior to the 2014

midterm elections, Project Vote remained committed to obtaining the Requested Records so it could provide oversight for future elections.  On November 12, 2014, December 2, 2014, January 26, 2015, and March 10, 2015, Malone emailed Germany to inquire as to the status of the Records Requests.  Germany responded on November 13, 2014, and January 27, 2015, each time stating that he would provide materials to Project Vote "shortly."  Exhibit K.

60.     On or about April 3, 2015, almost eleven months after Project Vote's May 13, 2014 Records Requests and almost six months after Project Vote notified Defendant of the deficiencies in the NVF Report, Defendant provided a report that purported to include all voters or applicants rejected or canceled for any reason from October 1, 2012, through March 8, 2015 (the "Canceled Voter Report").

61.     The Canceled Voter Report did not satisfy Project Vote's Records Requests.  The Report did not include data specifically requested by Project Vote and within Defendant's possession, custody, and control, including the DDS/SSN Data;[7] records showing applicants pending verification or not added to the rolls for

---

[7]      The Canceled Voter Report included only the following data fields: County Code; Registration Number; Voter Status; Canceled Date; Canceled Reason; Last Name; First Name; Middle Name; House Number; Street Name; City; Zip; Year of Birth; Registration Date; Race; Gender.

reasons other than being rejected or canceled;[8] or records or data sufficient to allow Project Vote to understand the rejection and cancelation codes contained in the Report.  For example, the Report defined "HER" as just "Hearing," both "NVF" and "REJ" as "Not Verified," with no explanation of a distinction between them, and "ERR" as just "Error."  Such codes by themselves do not allow Project Vote to assess Georgia's voter registration procedures.

62.     On or about the same date that Defendant provided the Canceled Voter Report, media sources reported that former Georgia Elections Director Linda Ford resigned after illegally changing the status of almost 8,000 voters from inactive to canceled within 90 days before an election in violation of federal law.

### D.     Project Vote's Entitlement to Sue for Defendant's NVRA Violations

63.     Defendant's refusal to make the Requested Records available has directly injured and continues to injure Project Vote.  The NVRA provides Project Vote the right to inspect the Requested Records.  Defendant's refusal to make the Requested Records available to Project Vote violates that right.  As a result,

---

[8]     Project Vote believed that the category of applicants pending or otherwise not added to the rolls contained a significant number of applicants.  Media sources reported in October of 2014 that numbers of pending – and as one group indicated, missing – applicants were uncharacteristically high.  *See, e.g.*, Kristina Torres, *AJC Analysis: Georgia Sees Surge in Voter Rolls*, Atl. J.-Constitution (Oct. 7, 2014), http://www.myajc.com/news/news/state-regional-govt-politics/ajc-analysis-georgia-sees-surge-in-voter-rolls/nhdgL/.

Project Vote has been unable to assess Georgia's voter registration procedures, and so long as Defendant continues to withhold access, it will be unable to do so. Without such information, Project Vote cannot effectively educate partner organizations in the effective and efficient administration of voter registration drives or educate Georgia eligible voters regarding becoming registered to vote under Georgia's procedures. Further, Project Vote is unable to determine whether violations of federal election laws have occurred in Georgia. Project Vote's injury will be redressed by the relief sought in this suit, including an injunction prohibiting Georgia from continuing to withhold access to records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.

64.    By letter on July 6, 2015, Project Vote, on behalf of itself and all others similarly aggrieved, notified Defendant pursuant to Section 11(b) of the NVRA that Defendant had violated the NVRA by failing to satisfy Project Vote's Records Requests. Letter from Ference-Burke to Secretary Kemp (July 6, 2015), attached to Ference-Burke Decl. as Exhibit L ("NVRA Notice Letter"). Specifically, Project Vote informed Defendant that his office had violated the Public Disclosure Provision's requirement that "all records" be made available for inspection and copying, at no cost. The NVRA Notice Letter provided detailed

descriptions of the Requested Records, as well as detailed explanations of the deficiencies of the records provided by Defendant to date.

65.    On July 7, 2015, Jonathan Ference-Burke of Ropes & Gray LLP discussed the outstanding Records Requests with Germany.  Germany represented that the Canceled Voter Report encompassed all applicants and voters rejected or canceled in the two years preceding the date of the Report.  He further stated that he would be willing to provide Project Vote with a copy of the GVRS Manual.

66.    By letter dated August 25, 2015, Germany responded to Project Vote's NVRA Notice Letter.  *See* Letter from Germany to Ference-Burke (Aug. 25, 2015), attached to Ference-Burke Decl. as <u>Exhibit M</u>.  Germany acknowledged that Defendant had not provided the DDS/SSN Data, the database underlying the Requested Records relating to all applicants rejected, canceled, or not added to the rolls, or records related to applicants pending verification.  Regarding the DDS/SSN Data, Germany represented that Defendant does not "break out the[] results" of DDS versus SSA non-matches, but indicated that he would investigate whether the data are available, and if so, that he would be willing to provide them. Regarding the database, Germany represented that Defendant would not provide access to the database due to alleged data security and cost concerns.  With regard to applicants pending verification, he represented that Defendant would be willing

to provide a dynamic pending list.

67.     With the August 25 letter, and almost a year after Project Vote's
September 24, 2014 Records Requests, Defendant provided the GVRS User Guide,
GVRS Manual, and other training materials.

### E.     Project Vote's Efforts to Resolve Its Outstanding Records Requests Outside of Court Proceedings

68.     Relying on Germany's representations that Defendant would be
willing to satisfy or discuss Project Vote's outstanding Records Requests, Project
Vote continued its discussions with Germany.

69.     On September 18, 2015, Ference-Burke and Nicole Durkin of Ropes
& Gray LLP discussed Project Vote's outstanding Records Requests with
Germany.  Ference-Burke requested a conference call between Georgia's and
Project Vote's respective IT staffs to discuss the availability of the outstanding
records and data.

70.     On September 30, 2015, to facilitate further discussions, Ference-
Burke provided Germany with a summary of the outstanding Records Requests.
He explained that Project Vote was willing to work with Defendant to set up a
query of the GVRS database in order to obtain the DDS/SSN Data and other
Requested Data it sought.  According to the training materials provided, these data
exist in the GVRS database and are in Defendant's possession, custody, and

control.  Further, Ference-Burke clarified that, as previously discussed, the DDS/SSN Data should include data indicating whether rejection was due to a non-match with DDS records or a non-match with SSA records, and if so, which DDS or SSA field(s) resulted in the non-match.  *See* Emails between Ference-Burke and Germany (Sept. 30, 2015 to Dec. 17, 2015), attached to Ference-Burke Decl. as Exhibit N.

71.    One month later, on October 30, 2015, Germany responded to Ference-Burke's email.  *Id.*  Germany represented that his office could provide Project Vote the information it needed regarding the reasons for applicants' rejections; that "it should be fairly easy to set up a way for Project Vote to get" records regarding the pending list "periodically going forward"; and that his office would be "happy to discuss . . . any codes that you need further info on."  *Id.*  Germany further represented that his office had provided all of its policies and manuals and that no algorithm existed for assigning voter registration applicants to status codes.  *See id.*

72.    On November 12, 2015, Germany, Mellor, Ference-Burke, Durkin, and representatives of Defendant's and Project Vote's IT staffs participated in a conference call to discuss Project Vote's outstanding Records Requests and, in particular, to discuss the availability of the Requested Data and the ability of

Defendant to run a query of its GVRS database to obtain the Requested Data. Project Vote again summarized its outstanding requests and, specifically, the data it sought via the GVRS query or other means. Germany responded that his office could not provide Project Vote with access to the GVRS database because of alleged data security and cost concerns and because the database is part of a larger, proprietary database controlled by a third-party administrator. To accommodate these limitations and facilitate its outstanding requests, Project Vote proposed that, in lieu of the database, Georgia provide it with an inventory of the data fields and tables contained in the database, as well as a database schematic describing any relationships between the fields and tables. Project Vote would then use the inventory and schematic to identify the data fields responsive to its outstanding requests, to allow Defendant to run a targeted query to obtain the data. Germany indicated that his office would be willing to discuss providing the list and schematic.

73.    On November 16, 2015, Ference-Burke emailed Germany to request the inventory of GVRS data fields and tables. Exhibit N. Ference-Burke inquired about the status of that request on December 3, December 9, and December 17, 2015. *Id.*

74.    One month after Ference-Burke's request, on December 18, 2015,

Germany provided Project Vote with a PDF file purporting to contain the names of all GVRS data fields and tables, as well as a PDF file purporting to describe the relationships between the tables.  *See* Emails between Ference-Burke, Durkin, and Germany (Dec. 18, 2015 to May 5, 2016), attached to Ference-Burke Decl. as Exhibit O.  The 340-page data fields and tables document provided only abbreviated names of numerous tables and fields, with no definitions,[9] and the diagram represented relationships using only lines and arrows, the meaning of which was not explained or otherwise apparent.

76.     On March 4, 2016, after Project Vote carefully reviewed the files provided, Ference-Burke emailed Germany a list of data fields and tables that Project Vote believed could contain the Requested Data, including the DDS/SSN Data, as well as a list of the Requested Data.  Project Vote requested that Defendant provide up-to-date versions of the records requested by Project Vote, revised to include data from the data fields and tables identified by Project Vote, and to the extent not included in those data fields and tables, to include the Requested Data.  *Id.*

76.     On April 15 and May 5, 2016, Durkin emailed Germany to inquire

---

[9]      For example, one table named "GVRS.EXT_DDS_IN_VERIFICATION" included fields such as "DT_ADD" and "CD_SSN_RESPONSE."

about the status of Project Vote's outstanding requests.  She explained that "it is

imperative that [Project Vote] obtain the requested information immediately" in

light of the approaching 2016 United States elections.  *Id.*

77.     On May 5, 2016, approximately two months after Project Vote's

requests for updated records containing the identified data fields and tables,

Germany responded that he would "get back to [Project Vote] as soon as I can with

a time and cost estimate to fulfill the request."  He characterized Project Vote's

efforts to facilitate resolution of its outstanding Records Requests, now pending for

at least 19 months, as a "fishing expedition," and accused Project Vote of "not . . .

approaching this in a good faith manner."  *Id.*

78.     The same day, Durkin responded and requested that Germany provide

Project Vote with his cost proposal by no later than 5 p.m. Eastern on Tuesday,

May 10.  *Id.*  Germany did not respond.

79.     To date, Defendant has not made all of the Requested Records

available to Project Vote or its representatives.  Project Vote has never received the

records it requires to understand Georgia's reasons for rejecting, canceling, or

otherwise not adding applicants to the official list of eligible voters.

80.     Defendant's stonewalling frustrates and hampers Project Vote's

mission and violates Project Vote's rights under the NVRA.  Defendant's actions

have already prevented Project Vote from assisting rejected, canceled, or not added voter registration applicants with registering in time to vote in the 2014 United States midterm elections. Further stonewalling will frustrate Project Vote's efforts to educate groups and assist applicants with registering before future elections, including the fast-approaching 2016 United States general elections.

81.    The NVRA's civil enforcement provision allows for a private right of action by persons "aggrieved by a violation" after providing "written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1). If the violation is not corrected within 90 days after that official's receipt of such notice, the aggrieved person may bring a civil action in the appropriate district court for declaratory or injunctive relief with respect to the violation. *Id.* § 20510(b)(2).

82.    As outlined above, Defendant received notice of his NVRA violations and Project Vote's intent to file suit no later than July 6, 2015. Defendant has failed to correct his violations within the 90-day period prescribed by 52 U.S.C. § 20510(b)(2).

83.    Project Vote brings this suit to enforce its private right of action and rights under the NVRA to challenge Defendant's actions here.

**COUNT I**
**(Violation of the NVRA, 52 U.S.C. § 20501 *et seq.*)**

84.    Project Vote repeats and re-alleges the preceding allegations as though fully set forth herein.

85.    The Requested Records are within the possession, custody, and control of Defendant.

86.    The NVRA's Public Disclosure Provision unambiguously requires that the Requested Records be made available to the public for inspection and, where available, copying, because the Requested Records are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  52 U.S.C. § 20507(i)(1).

87.    Defendant has violated, and continues to violate, the Public Disclosure Provision by refusing to make the Requested Records available for inspection by Project Vote within the meaning of the NVRA.

88.    The NVRA and its Public Disclosure Provision place binding requirements on the states.  To the extent that any state law conflicts with, overrides, or burdens the NVRA, such law is preempted and superseded by the NVRA as a federal statute.

89.    To the extent that any Georgia statute, regulation, practice, or policy allows officials to charge for making documents available for public inspection,

such provisions, practices, and policies conflict with the plain language of the NVRA and are therefore invalid and unenforceable and are preempted by the NVRA.

## COUNT II
### (Declaratory Judgment)

90.     Project Vote repeats and re-alleges the preceding allegations as though fully set forth herein.

91.     A justiciable controversy exists between Project Vote and Defendant concerning Defendant's obligations under the Public Disclosure Provision of the NVRA.

92.     There is no adequate remedy, other than that requested herein, by which this controversy may be resolved.

93.     Project Vote seeks a declaration to resolve the controversy between the parties regarding Defendant's obligations under the Public Disclosure Provision and the NVRA.

94.     The Court should declare that Defendant's obligations under the Public Disclosure Provision include, but are not limited to, the following:

(a)     The Public Disclosure Provision guarantees Project Vote the right to inspect or make copies of each of the Requested  Records.

(b)     Defendant has no legitimate basis for refusing to make the Requested Records available to Project Vote as required by the NVRA.

(c)     Defendant must immediately make the Requested Records available to Project Vote by August 1, 2016, with updates at monthly intervals thereafter and on October 1, 15, 31, November 15, and December 15, 2016.

(d)     Defendant must make the Requested Records available to Project Vote for public inspection in electronic form, at no cost to Project Vote.

95.     Project Vote is entitled to a declaratory judgment against Defendant.

## COUNT III
**(Injunctive Relief)**

96.     Project Vote repeats and re-alleges the preceding allegations as though fully set forth herein.

97.     Project Vote is substantially likely to prevail on the merits of its claim that Defendant's refusal to make the Requested Records available for inspection and copying contravenes the plain language of the Public Disclosure Provision.

98.     Absent injunctive relief, Project Vote will suffer irreparable harm in that it will be hampered in its mission of making sure that eligible voters can register, vote, and cast a ballot that counts.  Specifically, Project Vote will be

hampered in educating eligible voters and other organizations that assist eligible

voters in Georgia to register in this 2016 election cycle, and will be prevented from

assessing whether eligible voters are properly added to and not removed from the

Georgia voter roll in time to exercise their rights in the upcoming elections.

99. Legal remedies are inadequate to address Defendant's continuing

violation of the NVRA. No award of damages would compensate Project Vote for

Defendant's denial of its rights to inspect and copy the Requested Records.

100. The balance of interests, reflected in the Public Disclosure Provision,

weighs strongly in favor of public access to the Requested Records. Granting

injunctive relief would cause no harm to Georgia or Defendant, who would be

required to do nothing more than fulfill a statutory duty to provide access.

101. Injunctive relief prohibiting Defendant from continuing to violate the

NVRA serves the public interest. The public availability of these records ensures

that citizens and voter registration organizations are able to oversee the voter

registration process and identify and correct any existing election administration

problems. This oversight serves the public interest and the NVRA's stated

purposes to "increase the number of eligible citizens who register to vote" in

federal elections, "enhance[] the participation of eligible citizens as voters,"

"protect the integrity of the electoral process," and "ensure that accurate and

current voter registration rolls are maintained." 52 U.S.C. § 20501(b).

102.   Project Vote is entitled to injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and that the Court:

(a)      Declare that Defendant is in violation of the NVRA by refusing to make the Requested Records (as defined herein) available for inspection and copying;

(b)      Order Defendant to provide Project Vote with electronic copies of the Requested Records by August 1, 2016, to allow Project Vote sufficient time to assist any voter registration applicants rejected, canceled, or not added to the rolls with registering to vote by Georgia's October 11, 2016 voter registration deadline for the 2016 United States general elections, with updates at monthly intervals thereafter and on October 1, 15, 31, November 15, and December 15, 2016;

(c)      Order that the Court will retain jurisdiction over this matter to ensure that Defendant properly provides Project Vote with electronic copies of the Requested Records by the ordered deadline, to otherwise monitor Defendant's compliance with any order from the Court and the NVRA, and

to address any requests for sanctions and penalties for violations of any order from the Court or the NVRA;

(d)    Permanently enjoin Defendant from refusing to permit access to any requesting party for records required to be made available for public inspection and copying by the Public Disclosure Provision of the NVRA;

(e)    Award Plaintiff the costs incurred in pursuing this action, including attorneys' fees and reasonable expenses, as authorized by 52 U.S.C. § 20510(c) and other applicable provisions; and

(f)    Grant such other and further relief as the Court deems proper. Respectfully submitted this 6th day of July, 2016.

[signature on following page]

<u>/s/ James W. Cobb</u>
James W. Cobb
Georgia Bar No. 420133
T. Brandon Waddell
Georgia Bar No. 252639
**CAPLAN COBB LLP**
75 Fourteenth Street, NE
Suite 2750
Atlanta, Georgia 30309
Tel:  (404) 596-5600
Fax:  (404) 596-5604
jcobb@caplancobb.com
bwaddell@caplancobb.com

**ROPES & GRAY LLP**

John C. Ertman
David E. Rhinesmith
Jonathan R. Ference-Burke
Nicole C. Durkin
David A. Young
(*pro hac vice* applications forthcoming)
2099 Pennsylvania Ave NW
Washington, DC 20006
(202) 508-4695
david.rhinesmith@ropesgray.com

Michelle E. Kanter Cohen
(*pro hac vice* application forthcoming)
**PROJECT VOTE, INC.**
1420 K Street NW, Suite 700
Washington, DC 20005
(202) 546-4173
mkantercohen@projectvote.org

*Counsel for Project Vote, Inc.*