IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PROJECT VOTE, INC.,

                    Plaintiff,

      v.

BRIAN KEMP, in his official
capacity as Secretary of State and
Chief Election Official for the State
of Georgia,

                    Defendant.

1:16-cv-2445-WSD

## OPINION AND ORDER

This matter is before the Court on Defendant Brian Kemp's ("Defendant")

Motion to Dismiss [20].  Also before the Court is Plaintiff Project Vote, Inc.'s

("Plaintiff") Motion for Preliminary Injunction [12].

## I.      BACKGROUND

###     A.    Summary

Plaintiff seeks the disclosure, pursuant to the National Voter Registration

Act of 1993 ("NVRA"), 52 U.S.C. § 20501, et seq., of certain records relating to

the reasons Defendant rejected, canceled, or otherwise did not add voter

registration applicants to Georgia's voter roll.  Plaintiff requests these records be

produced prior to Georgia's October 11, 2016, voter registration deadline.

Defendant contends the records Plaintiff seeks are not subject to disclosure under the NVRA.

      B.    <u>Background of the NVRA</u>

The NVRA became effective on January 1, 1995.  In its first section, Congress made explicit the findings and purposes underlying the act.  52 U.S.C. § 20501.  Congress found "(1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities."  <u>Id.</u> § 20501(a)(1)-(3).  The purposes of the NVRA are:  "(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office; (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office; (3) to protect the integrity of the electoral process; and (4) to ensure that accurate and current voter registration rolls are maintained."  <u>Id.</u> § 201501(b)(1)-(4).  The NVRA's "primary emphasis" is to "simplify the methods for registering to vote in federal elections and maximize such opportunities for a

state's every citizen." United States v. Louisiana, ⸻ F. Supp. 3d ⸻, 2016 WL 4055648, at *7 (M.D. La. July 26, 2016) (citing Colon-Marrero v. Velez, 813 F.3d 1, 9 n.13 (1st Cir. 2016)).  It also seeks to "'protect the integrity of the electoral process.'"  Id. (quoting Nearman v. Rosenblum, 371 P.3d 1186 (Or. 2016)).

The NVRA requires, in addition to any other method of voter registration provided under State law, that each State shall establish the following three procedures to register to vote in Federal elections:  (1) pursuant to Section 5, "by application made simultaneously with an application for a motor vehicle driver's license . . .;" (2) pursuant to Section 6, "by mail application . . .;" and (3) pursuant to Section 7, "by application in person" at a voter registration agency ("VRA").  52 U.S.C. § 20503(a)(1)-(3).

Section 7 defines VRAs and includes the requirement that States designate as VRAs "all offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities."  Id. § 20506(a)(2).

Section 8 of the NVRA, titled "Requirements with respect to administration of voter registration," addresses the States' administration of the voter registration lists to "ensure that any eligible voter is registered to vote in an election."  Id. § 20507(a)(1).  It provides a registration deadline for the three registration methods

3

detailed in Sections 5-7.  Id. § 20507(a)(1)(A)-(C).[1]  To ensure accurate voter

registration lists, the State is required to provide notice to applicants regarding the

disposition of their application and "provide that the name of a registrant may not

be removed from the official list of eligible voters" except "at the request of the

registrant[,]" "as provided by state law," and by "a general program that makes a

reasonable effort to remove the names of ineligible voters from the official lists of

eligible voters" because of death of a registrant or a change in the registrant's

residence.  Id. § 20507(a)(3)-(4).[2]

Section 8 further provides that "[a]ny state program or activity to protect the

integrity of the electoral process by ensuring the maintenance of an accurate and

current voter registration roll" "shall be uniform, nondiscriminatory, and in

compliance with the Voting Rights Act of 1965[,]" and shall not remove "the name

of any person . . . by reason of the person's failure to vote . . . ."[3]  Id. § 20507(b).

Subsections (c), (d), (e) and (f) provide a comprehensive process for considering

---

[1]   A state may make a reasonable effort to remove the names of eligible voters
from the rolls under Section 8(a)(4).  These reasonableness requirements include
using Postal Service requirements to "identify registrants whose addresses may
have changed" if the Postal Service lists are used in accordance with the process
set out in Section 8(c)(1)(B).
[2]   The NVRA provides for various notification requirements and other
ancillary requirements such as protecting against the disclosure to the public of the
identity of voter registration agencies.
[3]   This is subject to other limitations under Section 8(c)(1)(B)(2), (d) and (e).

removal based on change of address and where a registrant shall cast their vote.

The process for removal of a voter must be completed "not later than 90 days prior

to the date of a primary or general election for Federal office . . . ." Id.

§ 20507(c)(2)(A).  Subsection (g) of Section 8 details the process for advising

election officials of Federal convictions.[4]

The final substantive provision of Section 8 is subsection (i), entitled "Public

disclosure of voter registration activities."  Subsection (i) provides:

> (1)    Each State shall maintain for at least 2 years and shall make
> available for public inspection and, where available,
> photocopying at a reasonable cost, all records concerning the
> implementation of programs and activities conducted for the
> purpose of ensuring the accuracy and currency of official lists
> of eligible voters, except to the extent that such records relate to
> a declination to register to vote or to the identity of a voter
> registration agency through which any particular voter is
> registered.

> (2)    The records maintained pursuant to paragraph (1) shall include
> lists of the names and addresses of all persons to whom notices
> described in subsection (d)(2) are sent, and information
> concerning whether or not each such person has responded to
> the notice as of the date that inspection of the records is made.

Id. § 20507(i).[5]

---

[4]    Federal convictions may be used by a state to determine a person's
eligibility to vote.

[5]    Section 9 provides the Election Assistance Commission authority to
promulgate regulations to develop a mail voter registration application form for

Section 8(d) provides that States may not remove a registrant from the voter roll on the ground that he changed his address unless (1) the registrant confirms in writing that he has moved outside the registrar's jurisdiction or (2) the registrant (i) fails to respond to a specific notice about voting and address changes, and (ii) has not voted, or appeared to vote, during a defined time period.  Id. § 20507(d)(1)-(2).

In Section 11, titled "Civil Enforcement and Private Right of Action," the NVRA provides two coequal enforcement methods.  Louisiana, 2016 WL 4055648, at *8.  First, Section 11 provides that the United States Attorney General "may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter."  52 U.S.C. § 20510(a). Second, Section 11 creates a private right of action:

> (1)   A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.
>
> (2)   If the violation is not corrected within 90 days after receipt of a notice under paragraph (1) . . ., the aggrieved person may bring

---

elections for federal office, and provides the requirements for the contents of the federal mail voter registration form.  Id. § 20508.  Section 10 requires that "[e]ach State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA.  Id. § 20509.

> a civil action in an appropriate district court for declaratory or
> injunctive relief with respect to the violation.

Id. § 20510(b)(1)-(2).[6]

C.   Facts

1.   Parties

Plaintiff is a "national, non-partisan, non-profit organization" with a stated

mission to "build an electorate that accurately represents the diversity of America's

citizenry and to ensure that every eligible citizen can register, vote, and cast a

ballot that counts." ([12.1] at 2; Compl. [1] ¶ 20).  Defendant is the Georgia

Secretary of State, the chairperson of the Georgia State Election Board, and the

State's chief election official.  ([12.1] at 4).  He is responsible for maintaining

Georgia's voter registration list, which, since 2013, has been stored on an

interactive, computerized database known as ENET GVRS (the "Database").

(Compl. ¶ 21; [18] at 3 & n.2).  Georgia uses the Database to meet its obligation,

under Section 303(a) of the Help America Vote Act of 2002, to maintain "a single,

uniform, official, centralized, interactive computerized statewide voter registration

list . . . ."  52 U.S.C. § 21083(a)(1)(A).

---

[6]   Section 12 provides criminal penalties for knowingly or willfully engaging
in voter intimidation or submitting a false voter registration application.  Id.
§ 20511.

2.     Georgia's Voter Registration Procedure

Voter registration in Georgia is conducted at the county level.  ([18] at 3).

Voter registration applications are sent to county registrars.  Registrars access the

Database to update registration records for their respective counties.  (Id.; Second

Decl. of S. Merritt Beaver [18.2] ("Second Beaver Decl.") ¶ 5).  Defendant does

not register voters or maintain copies of voter registration applications.  (Second

Beaver Decl. ¶ 3; August 19, 2016, Dep. of S. Merritt Beaver [34.1] ("Beaver

Dep.") at 56:7-12).

When county registrars receive a paper voter registration application, they

enter the applicant's information into the Database.  ([1.2] at 7; Beaver Dep.

at 34:15-17, 36:20-22).  The applicant's information is then electronically

"batched" overnight and electronically sent to the Department of Driver Services

("DDS") for verification.  (Beaver Dep. at 47:25-48:3, 72:12-16).  If the applicant

provides a Georgia driver's license number, DDS uses its records to verify the

applicant's first name, last name, date of birth, and driver's license number.  See

52 U.S.C. § 21083(a)(5)(B); (Beaver Dep. at 77:14-18).  If the applicant supplies

the last four (4) digits of his Social Security Number ("SSN"), but not his driver's

license number, DDS uses Social Security Administration ("SSA") records to

verify the applicant's first name, last name, date of birth, and last four (4) digits of

8

his or her SSN.  (Beaver Dep. at 77:19-78:2, 97:17-21).  Applying its "matching algorithm," DDS considers an applicant's information verified where it exactly matches DDS or SSA records.  (Id. at 78:3-79:1; 98:3-9).[7]  DDS also uses its records to verify whether an applicant is a United States citizen.  (See, e.g., id. at 66:4-5, 70:11-23, 76:14-21, 98:23-99:4, 102:3-5).

Where voter registration applications are submitted online or through the Department of Driver Services ("DDS"), they are screened by the DDS or others and, if verified, enter the Database automatically.  (Beaver Dep. at 37:1-5, 125:25-126:20).  These applications are not included in the overnight batches sent to the DDS for verification.  (See id. at 125:14-126:4).  Approximately sixty (60) percent of applications are submitted through DDS.  (Id. at 126:6-8).  Online applications are permitted to be submitted by individuals with a Georgia driver's license or Georgia identification card.  (Second Beaver Decl. ¶ 7; Beaver Dep. at 59:10-17).

The results of the DDS verification process are available in the Database the day after the application is batched and sent to DDS for review.  (Beaver Dep. at

---

[7]     On August 23, 2010, the United States Department of Justice approved this exact match registration requirement.  Aaron Gould Sheinin, Justice Department Approves Georgia Voter Registration System (Aug. 23, 2010), http://www.ajc.com/news/news/local-govt-politics/justice-department-approves-georgia-voter-verifica/nQjcy/

72:12-17).  After the verification process is complete, the county registrar reviews the application to determine if other action is necessary or whether the applicant can be registered as an active voter.  (See id. at 73:18-22, 75:4-13).[8]  If DDS cannot verify the applicant's information, the country registrar notifies the applicant in writing of the unverified information.  (See id. at 106:6-11); O.C.G.A. § 21-2-220(d).  If the applicant does not respond to the notification within forty (40) days, the application is canceled.  (Beaver Dep. at 106:15-22); O.C.G.A. § 21-2-220(d).[9]  If the applicant timely responds to the notification by providing the missing information, the registrar enters the new information into the Database and the updated application is processed through the verification process.  ([1.2] at 10).

Each voter registration applicant in the Database is assigned one of the following status designations:  active, inactive, pending, rejected, or canceled.

---

[8]    That an applicant's information is verified by the DDS does not guarantee registration as an active voter.  County registrars determine whether, and when, to register an applicant.  (Beaver Dep. at 43:3-18, 73:18-22, 75:9-11; but see id. at 34:24-25 (contemplating a situation where "the system put [an applicant] active")).  For example, the registrar may decline to register a DDS-verified applicant because his application is not signed.  (Id. at 43:14-18).

[9]    This cancellation may occur mechanically or manually.  County registrars may add an input to the Database that precludes the application from being canceled automatically after forty (40) days.  (Beaver Dep. at 107:24-108:11).  It is unclear whether there is a system in place to confirm that registrars timely and accurately update information on the Database.

(Second Beaver Decl. ¶ 10).  An application is "rejected" only if it states that the applicant is younger than seventeen and a half years of age or not a United States citizen.  (Beaver Dep. at 101:7-102:2, 102:24-103:8).[10]  An application is "pending" where the applicant's information is awaiting verification, including the receipt of information the applicant is requested to provide, and, absent unusual circumstances, a pending applicant will be assigned an active or canceled status within approximately forty (40) days.  (Second Beaver Decl. ¶ 21; [1.14] at 5; [1.15] at 7).  Applicants removed from, or those whose applications are not verified and not added to, the list of registered voters are assigned a status of "canceled."[11]  (See Second Beaver Decl. ¶ 11).

> 3.   Georgia's Voter Registration Database

In 2013, PCC Technology, Inc. ("PCC"), a third-party vendor based in Connecticut, developed the Database under a contract with Defendant.  (Beaver Dep. at 21:1-10, 22:6-23:1, 108:12-14).  The Database stores voter registration information about all applicants and consists of multiple linked tables.  (Id. at

---

[10]   Rejected applications are nonetheless entered into the Database.  (Beaver Dep. at 103:10-11).

[11]   Neither the Complaint nor the record clearly defines, or distinguishes between, "active" and "inactive" voters.  These statuses are not material here because Plaintiff seeks information only about canceled, rejected, or pending applicants.

35:25-36:8).  The base table holds static information such as the applicant's name and voter registration number.  (Id. at 36:1-6).  Other tables are dynamic and the information in them, such as the reason for the applicant's registration status, changes as the data about the applicant changes.  (Id. at 36:7-15).  The base table links to and draws information from the other tables, to create a consolidated report of an applicant's voter registration record.  (Id. at 37:11-21).

Audit tables are one of the dynamic tables that link to the base table.  These tables record all "transactions" associated with an applicant's record, including the date and type of the transaction.  (Id. at 55:20-56:2, 79:23-25, 88:14-15, 89:8-12).  Transactions include changes, whether manual or mechanical, to an applicant's address, voter registration status, felony status, or other information.  (Id. at 89:17-90:6).  The audit tables are "built each time" they are accessed, and can only be viewed in the Database one registration record at a time.  (Id. at 83:16-23; see also id. at 65:23-25, 84:9-13, 130:13-131:3).  The Database, as it currently functions, cannot meaningfully aggregate audit information about multiple applicants.  (Id. at 83:16-84:8, 90:7-8).  Because the audit tables record historical, as well as the most recent, transactions in each data field, Database users can "build a story of what happened" to each application after it was entered into the Database.  (Id. at 55:20-56:2; see also id. at 37:22-24, 89:24-90:5, 110:21-111:20).

Defendant contracts with PCC, which currently manages the Database, to run customized reports or programs not already built into the system.  (Id. at 24:5-19).

   4. Procedural History and Plaintiff's Request for Records under the NVRA

  In early 2014, Plaintiff received reports that officials were asking Georgia voters for documentary proof of United States citizenship.  (Compl. ¶ 38).  To investigate these reports, on May 13, 2014, Plaintiff requested Defendant to produce "records related to voter registration applicants not added to the official list of eligible voters, or flagged as requiring additional documents before voting with a regular ballot, because the applicant had not submitted satisfactory proof of citizenship . . . ."  (Compl. ¶ 39).[12]  Plaintiff also requested materials describing any data codes used in the records, and any policies, manuals, or other guidance related to citizenship verification.  (Compl. ¶ 39).  Plaintiff made these requests pursuant to Section 8(i) of the NVRA.  (See [1.3] at 3).

---

[12] Plaintiff specifically requested the following information for each applicant: (1) name, (2) contact information, (3) date of birth, (4) race, (5) voter identification number, (6) date the applicant signed his application, (7) date the application was received by election officials, and (8) "[a]ll records relating to the processing of the application such as" (i) date the application was processed or entered into the Database, (ii) current registration status, (iii) date and history of any status changes, (iv) type, date and status of any letters sent to the applicant, and any response received.  ([1.3] at 2-3).

In September 2014, Plaintiff became concerned that "large numbers" of qualified voter registration applicants were not being added to the voter roll. (Compl. ¶ 44). As a result, on September 24, 2014, Plaintiff broadened its May 13, 2014, information request to include information about applicants not added to the voter roll for any reason, including reasons unrelated to citizenship. (Compl. ¶ 45).[13] Plaintiff told Defendant it wanted to review the records, and resolve any related issues, before the 2014 United States midterm elections. (Compl. ¶ 43).

On October 6, 2014, voter registration for the Georgia midterm elections ended. (Compl. ¶ 48). On October 14, 2014, Defendant provided Plaintiff with a list of approximately 14,000 applicants who were not added to the voter rolls because their information did not match records in the DDS or SSA databases. (Compl. ¶ 52). Defendant also provided Plaintiff with training materials related to citizenship verification. (See Compl. ¶ 54; [1.10]). On October 15, 2015, Plaintiff informed Defendant that the October 14, 2014, production was not, in its opinion,

---

[13]     Plaintiff requested the same information about these applicants that was requested on May 13, 2014. ([1.11] at 4). Plaintiff repeated its requests for "definitions for any codes used in the records, in particular the code for rejection reasons[,]" and a list of applicants rejected because of their citizenship. (Id.). Plaintiff also requested a statewide list of registered voters, which Defendant promptly provided. (Id.; [1.13] at 5).

complete.  (Compl. ¶ 53; [1.10]).  Plaintiff stated the production included only a

subset of applicants not added to the voter roll, did not identify applicants rejected

because of citizenship, and did not define the data codes used in the production.

(Compl. ¶ 53).

On October 30, 2014, Plaintiff made a more specific request for the

information it wanted Defendant to provide.  It asked for the following records:

(1)    A list of all rejected voters and all canceled voters in the last
       two years (from October 1, 2012 to present), along with the
       reasons for the rejection or cancelation of each person. . . . [and]
       whether those individuals used a Social Security number or
       Driver's License number on their applications.

(2)    The complete database file underlying the above lists, also
       including any voters that are not on either of the above lists. . . .

(3)    A key to all codes, fields and abbreviations used in the database
       and lists, so that Project Vote can understand the stated reasons
       for rejection or cancelation of individual voters.

(4)    All manuals and other guidance documents regarding the
       processing of voter registration applications and use of the
       Georgia Voter Registration System (GVRS). . . .

(5)    Instructions provided to programmers or other staff on how to
       construct the DDS and SSN matches with GVRS as currently
       used, including the algorithm used to conduct the match.

([1.12] at 4-5).[14]

On April 3, 2015, Defendant provided Plaintiff with a report that purported to include all applicants, since October 1, 2012, who were rejected or canceled as of March 8, 2015.  (Compl. ¶ 60).  Defendant created this custom report with support from PCC, because the report could not be generated using existing Database software.  (First Decl. of S. Merritt Beaver [18.1] ("First Beaver Decl.") ¶ 11).[15]  Defendant also provided Plaintiff with brief descriptions of the cancellation codes used in the report to show the reason for cancellation.  (Id. ¶ 16).[16]

On July 6, 2015, Plaintiff formalized its dispute by sending Defendant written notice, under Section 11(b) of the NVRA, that Defendant had violated

---

[14]   On November 4, 2014, Georgia held the 2014 United States midterm elections.

[15]   This report contained the following information for approximately 568,000 unique voter registration numbers cancelled from October 1, 2012, through March 8, 2015:  (1) county code, (2) registration number, (3) registration status, (4) canceled date, (5) canceled reason, (6) registration date, and (7) the applicant's name, address, birth year, race and gender.  ([18] at 5 & n.5; First Beaver Decl. ¶¶ 12, 15).

[16]   Defendant's April 3, 2015, production listed one of fifteen (15) codes in each applicant's "Canceled Reason" data field.  With one exception, the code descriptions were between one (1) and three (3) words long.  ([18.1] ¶ 16).  For example, Defendant defined "HER" as "Hearing," "NVF" and "REJ" as "Not Verified," and "ERR" as "Error."  (July 13, 2016 Declaration of Brian Mellor [12.2] ("Mellor Decl.") ¶ 27).

Section 8(i) of the NVRA.  ([1.13] ("NVRA Notice")).  Plaintiff's NVRA Notice

described the records requested on October 30, 2014, and explained why it

contended that Defendant's productions failed to satisfy those requests.  Plaintiff

stated that Defendant did not provide (1) a complete list of rejected or canceled

applicants, (2) records for applicants not added to the voter roll for reasons other

than cancelation or rejection, (3) materials adequately explaining Defendant's data

codes or the specific reason an applicant was canceled, rejected or otherwise not

added to the voter roll, (4) a copy of the Database, and (5) all written policies,

manuals or other guidance regarding the processing of voter registration

applications.  (Id. at 2-6).  Plaintiff also stated that it suspected "a large number of

properly completed voter registration applications submitted by qualified and

eligible citizens of Georgia have been (and may continue to be) incorrectly

rejected, canceled, stalled, or otherwise not added to the Georgia voter rolls."  (Id.

at 2).

On August 25, 2015, Defendant responded to Plaintiff's NVRA Notice,

including by providing Plaintiff with training materials not previously produced.

(Compl. ¶ 67).  In his response, Defendant also stated that (1) he previously

provided all requested information about rejected or canceled applicants, (2) he

would provide Plaintiff with a list of "pending" applicants, the only other category

of applicants not added to the voter roll, and (3) he would discuss Plaintiff's request for additional information about data codes and the reasons for applicants' cancelation or rejection.  ([1.14]).[17]  Defendant also advised that, because of security and cost concerns, he would not provide a copy of the Database to Plaintiff.  (Id. at 4).

On September 30, 2015, Plaintiff sent Defendant a summary of the following "outstanding records requests:"  (1) a copy of the Database, (2) records regarding pending applicants, (3) additional information about the data codes used by Defendant, including because Plaintiff sought to understand the reason for each applicants' voter registration status, (4) training materials for programmers or data vendors, and (5) any algorithms used to assign Database codes to the applicants. ([1.15] at 7-8).

On October 30, 2015, Defendant reiterated that he could not provide a copy of the Database due to security and cost concerns, but would try to create a customized report containing any specific information sought by Plaintiff, including "whether [non-verified] applicants failed DDS or SSA verification."  (Id.

---

[17]     For example, Defendant stated that, although the Database did not differentiate between applicants whose information failed to match records in the DDS or SSA databases, Defendant would investigate whether that information was available.  ([1.14] at 4).

at 5-6).  Defendant also stated that he expected to be able to provide Plaintiff with a list of pending applicants, that he had provided Plaintiff with all existing documents defining Defendant's data codes, but would discuss the codes for which Plaintiff sought additional explanation, that he had provided Plaintiff with all of Defendant's policies and manuals, and that Defendant did not use algorithms to assign codes to applicants.[18]  (Id. at 6).

On November 12, 2015, Plaintiff and Defendant's IT staff held a teleconference to discuss Plaintiff's outstanding requests and how, if at all, Defendant could satisfy them.  (Compl. ¶ 72).  Defendant reiterated that he could not provide Plaintiff with a copy of the Database.  (Compl. ¶ 72).  On November 16, 2016, Plaintiff requested, as an alternative, an inventory of the data fields and tables used in the Database, and a schematic describing any relationship between the fields and tables.  (Compl. ¶ 72; [1.16] at 4).  On December 18, 2015, Defendant produced this information to Plaintiff.  (Compl. ¶ 74).  The production

---

[18]   Defendant stated that "[v]oter codes are assigned manually by local election officials."  ([1.15] at 6).  Defendant has since qualified this statement by advising that "[t]he status reason code can be entered by the county registrars or it can be a system generated code."  (Second Beaver Dep. ¶ 13).  It also appears that the system can cancel an applicant automatically.  (See Beaver Dep. at 66:9-13, 107:11-16 (describing situations where "the system will cancel" an applicant)).

included 340 pages of tables and data fields, and a schematic purporting to explain their relationship.  (Compl. ¶ 74).

On March 4, 2016, after reviewing Defendant's production, Plaintiff requested a variety of specific information about applicants who were rejected, canceled or pending.  ([1.16] at 3-5).  Plaintiff identified the data fields and tables potentially responsive to its requests.  (Id.).  Two months later, on May 5, 2016, Defendant responded by accusing Plaintiff of conducting a "fishing expedition" and of not approaching discussions "in a good faith manner."  (Id. at 1).  Later that day, Plaintiff told Defendant it would initiate legal proceedings unless Defendant offered, on or before May 10, 2016, a proposal to meet Plaintiff's requests.  (Id.).  Plaintiff claims that Defendant did not respond.  (Compl. ¶ 78).

Two months later, on July 6, 2016, Plaintiff filed its Complaint, alleging that Defendant refuses, in violation of Section 8(i)(1) of the NVRA, to disclose the following voter registration records requested by Plaintiff.

    A.    All records relating to voter registration applications that Defendant rejected, canceled, or otherwise did not add to the voter roll (e.g., applicants who are pending verification) since July 6, 2013, including all records relating to the specific reason an applicant was rejected, canceled, or otherwise not added to the voter roll.

    B.    Defendant's disclosure must include, but should not be limited to, the following:

      i.      Records reflecting whether a voter registration applicant was rejected, canceled, or otherwise not added to the voter roll because of a nonmatch with information in the [DDS] database or a non-match with information in the [SSA] database, and if so, which data field(s) resulted in the non-match.

      ii.      Records sufficiently explaining the specific reason an applicant was rejected, canceled, or otherwise not added to the voter roll, including records sufficiently explaining the meaning of any abbreviations or codes used to represent such reasons in Defendant's disclosure; and

      iii.      Records reflecting the algorithm or criteria by which information in a voter registration application is determined to match or not match information in the Georgia DDS or SSA databases.

(Compl. ¶ 7).  Plaintiff seeks declaratory and injunctive relief, and attorneys' fees and expenses.  (Compl. ¶¶ 90-102, Prayer for Relief).

On July 13, 2016, Plaintiff filed its Preliminary Injunction Motion, seeking an order requiring Defendant to disclose the records requested in Plaintiff's Complaint.  In view of Georgia's October 11, 2016, voter registration deadline for the 2016 general election, Plaintiff asked the Court to treat its Motion for Preliminary Injunction as an emergency motion under Local Rule 7.2(B).  On July 20, 2016, Defendant filed his Response in Opposition to Plaintiff's Motion for Emergency Status Regarding Preliminary Injunction Motion [15], and, the same day, produced to Plaintiff a digital file containing information about voter registration applications, asserting this production rendered Plaintiff's Motion for

Preliminary Injunction moot.  Defendant's July 20, 2016, production included, for all applicants since July 6, 2013, records of applicants with:  (1) a rejected or pending status as of July 18, 2016, and (2) a canceled status as of July 18, 2016, and which of the eleven specific cancellation reasons applied for each cancellation.[19]  ([15.2]; Second Beaver Decl. ¶¶ 14-16).[20]  The report also included a brief description of (1) the codes used to indicate the reasons for each applicant's registration status, (2) "information about the specific data that did not verify with either the DDS or SSA database," and (3) "information on whether the mismatch was with the DDS or SSA database."  ([15.2] at 4-5; Second Beaver Decl. ¶ 25). Defendant retained PCC to generate this report using "custom computer code." (First Beaver Decl. ¶¶ 5, 9).[21]  In view of Defendant's production, the next day Plaintiff withdrew its request for emergency treatment of its Motion for Preliminary Injunction.  ([17]).

---

[19]     Defendant inadvertently omitted "those few" canceled applicants with a status reason other than the eleven (11) options in the Database drop-down menu. ([18.2] ¶¶ 14-16).

[20]     Defendant's production included the following information for 646,332 unique voter registration numbers:  (1) registration number, (2) registration status, (3) status reason, (4) reason code, (5) date of cancellation, (6) action, (7) which data was verified and not verified by the DDS or SSA, (8) county name, and (9) the applicant's name, year of birth, address, race and gender.  ([18.1] ¶¶ 5, 7).

[21]     PCC worked on the project for sixty-four (64) hours and charged Defendant $5,120 for its work.  ([18.1] ¶ 10; Beaver Dep. at 124:25-125:7).

On August 3, 2016, Defendant filed his Motion to Dismiss [20] and his Motion to Stay All Discovery Related Activities [21] until Defendant's Motion to Dismiss is decided.

On August 9, 2016, Plaintiff filed its Motion for Expedited Discovery [24], requesting to conduct a deposition, under Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)"), "to test Defendant's assertions regarding the sufficiency and completeness of his July 18, 2016 [sic] production and the meaning of materials produced at that time." ([24] at 2).[22] Plaintiff sought to depose Defendant (i) on the meaning of undefined codes in Defendant's July 2016 production, (ii) on why Defendant has not produced certain requested records,[23] and (iii) "to test Defendant's claim that records he has not produced are wholly unavailable" and to ask whether other available records contain some or all of the same information. ([24] at 6-9).

---

[22]     Defendant represented that the production, delivered to Plaintiff on July 20, 2016, was current as of July 18, 2016. ([15] at 6).

[23]     For example, Plaintiff sought to understand why Defendant did not produce the following information for applicants not added to the voter roll: (1) the date the applicant signed his application, (2) the date the application was received by election officials, (3) the applicant's telephone number, and (4) records relating to the processing of the application, including (i) the date it was processed or entered into the Database; (ii) the history of any change in the applicant's registration status, and (iii) the type, date and status of any letters mailed to the applicant. ([24] at 7).

On August 10, 2016, the Court ordered [25] Plaintiff to identify (i) the specific undefined codes for which Plaintiff sought an explanation, (ii) the specific category or categories of records that Plaintiff requested but which Plaintiff claimed were not produced, and (iii) the requested records that, according to Plaintiff, Defendant claimed were unavailable.  On August 11, 2016, Plaintiff filed its Response to Order to Produce Information [26], providing the information requested by the Court.  The next day, the Court granted [29] Plaintiff's Motion for Expedited Discovery, temporarily relieved the parties of their obligation to comply with certain Local Rules processing requirements, and denied, as moot, Defendant's Motion to Stay All Discovery Related Activities.  The Court permitted Plaintiff to conduct a Rule 30(b)(6) deposition, on or before August 22, 2016, on the narrowly defined categories that Plaintiff requested.  The Court also permitted Plaintiff to file, on or before August 29, 2016, a supplement to its Reply in Support of its Motion for Preliminary Injunction [28].

On August 19, 2016, Plaintiff deposed S. Merritt Beaver, Defendant's Chief Information Officer, on the categories identified in the Court's August 12, 2016, Order.  (Beaver Dep. at 16:8-10).  On August 29, 2016, Plaintiff filed its Supplemental Reply in Support of its Motion for Preliminary Injunction [33].  In it, Plaintiff identifies, for canceled, rejected, or pending applicants, three categories of

records it contends Defendant is required, but has thus far failed, to produce.  The first category of requested records includes records in the Database that Defendant has not produced because doing so would be burdensome.  Plaintiff includes in this category records reflecting:

(1)   The date voter registration applications were signed by an applicant.

(2)   The date applications were entered into the Database.

(3)   Each change in an applicant's voter registration status.

(4)   The creation date of Database-generated letters to applicants.

(5)   Whether an election official manually, instead of mechanically, changed the status of one or more applicants.

(6)   Reasons other than the most recent reason why an applicant was rejected, canceled, or otherwise not added to the voter roll.

(7)   The specific reason why applicants, assigned a status reason of "Error," "Hearing," or "Reject," were canceled.

([33] at 6-7).

The second category of requested records includes records maintained in the Database that Defendant has not produced.  Plaintiff lists the following records in this category:

(1)   Records reflecting applicants' telephone numbers, if listed on their applications.

25

> (2)    Records for canceled applicants with a status reason other than one of the eleven options in the drop-down menu in the Database.
>
> (3)    Copies of Database-generated letters sent to applicants.

([33] at 9).

The third category of requested records are those not stored in the Database, but which Plaintiff maintains Defendant is nevertheless required to produce. Plaintiff lists the following records in this category:

> (1)    Records reflecting the date a voter registration application was received by election officials.
>
> (2)    The date and disposition of, and any response to, all letters sent to applicants.
>
> (3)    Copies of letters, not generated by the Database, that were sent to applicants.

([33] at 9-10).  Together, these three (3) categories of records, pertaining to canceled, rejected, or pending applicants, are defined as the "Requested Records."

## II.    SECTION 8(i)

The parties rely on Section 8(i) of the NVRA as the basis for their respective motions.  Defendant seeks to dismiss on the grounds that Section 8(i) does not require the disclosure of the Requested Records.[24]  Plaintiff seeks, under Section 8(i), to require Defendant to disclose the Requested Records.  The Court begins its analysis by considering whether the information Plaintiff claims is required to be disclosed is subject to disclosure under Section 8(i).

### A.    Principles of Statutory Construction

"The first step of statutory construction is to determine whether the language of the statute, when considered in context, is plain."  Wachovia Bank, N.A. v. United States, 455 F.3d 1261, 1267 (11th Cir. 2006) (citing Bautista v. Star Cruises, 396 F.3d 1289, 1295 (11th Cir. 2005)).  In the absence of a statutory definition, a court must look to the common and ordinary meaning of a word. See Animal Legal Def. Fund v. U.S. Dep't of Agric., 789 F.3d 1206, 1216 (11th Cir. 2015); Consol. Bank, N.A., Hialeah, Fla. v. U.S. Dep't of Treasury, Office of Comptroller of Currency, 118 F.3d 1461, 1463 (11th Cir. 1997)) ("As a basic rule

---

[24]    Defendant's arguments center on whether the Database, which contains the majority of the Requested Records, is itself a record.  Plaintiff's Requested Records do not seek the Database, and, to the extent Plaintiff previously sought the Database, that issue is not now before the Court.  (See [33] at 6-10).

of statutory interpretation, we read the statute using the normal meanings of its words."). "'[T]to determine the plain meaning of the statute' we must consider both 'the particular statutory language at issue' and 'the language and design of the statute as a whole.'" Wachovia, 455 F.3d at 1267-68 (internal quotation marks omitted) (quoting Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1278 (11th Cir. 2005)); see also Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997) (the plain meaning of a statutory provision is "determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole"); Burlison v. McDonald's Corp., 455 F.3d 1242, 1247 (11th Cir. 2006) ("[S]tatutes should be read a consistent whole[.]").  The Eleventh Circuit has emphasized that, in statutory construction, "context is king," and that "[c]ourts should avoid slicing a single word from a sentence, mounting it on a definitional slide, and putting it under a microscope in an attempt to discern the meaning of an entire statutory provision." Wachovia, 455 F.3d at 1267.

"If the meaning of the statutory language in context is plain, we go no further." Id. (citing United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998)). "Statutory language is ambiguous if it is susceptible to more than one reasonable interpretation." Med. Transp. Mgmt. Corp. v. Comm'r of I.R.S., 506 F.3d 1364, 1368 (11th Cir. 2007).  "Only when a statute's meaning is 'inescapably

ambiguous,' will this Court turn to legislative history to aid in interpretation." United States v. Williams, 790 F.3d 1240, 1245 (11th Cir. 2015) (quoting United States v. Veal, 153 F.3d 1233, 1245 (11th Cir. 1998), abrogated on other grounds by Fowler v. United States, 563 U.S. 668 (2011))).

B.      Analysis

The challenge in this case is interpreting, as a matter of first impression in our Circuit, the scope of the Section 8(i) disclosure provision.  To resolve whether the NVRA requires Defendant to disclose the Requested Records, the Court must determine:  (1) whether the Requested Records are "records" within the meaning of Section 8(i); (2) whether the Requested Records "concern[] the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," 52 U.S.C. § 20507(i)(1), and (3) whether each item of the Requested Records is required to be disclosed.  The analysis begins with the meaning of specific terms in Section 8(i).

1.      "Records"

Subsection 8(i)(1) requires a State to maintain and "make available for public inspection . . . all *records* concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  52 U.S.C. § 20507(i)(1) (emphasis added).

29

Defendant implicitly argues that the Requested Records maintained in electronic format on the Database are not "records," including because that term is limited to physical documents.  (See [18] at 19; [20.1] at 11).  Plaintiff argues the plain language of the statute does not exclude data maintained in an electronic database. ([28] at 3-10).

The statute does not define the term "records," and the Court thus begins with the common and ordinary meaning of the term.  See Animal Legal Def. Fund, 789 F.3d at 1216.  Dictionaries define "record" as:

- "something that serves to record," such as "a piece of writing that recounts or attests to something."  Webster's Third New International Dictionary 1898 (2002);

- "an account in writing or the like preserving the memory or knowledge of facts or events."  Webster's Encyclopedic Unabridged Dictionary of the English Language 1612 (2001);

- "[a]nything preserving information and constituting a piece of evidence about past events."  Oxford English Dictionary, available at http://www.oed.com;

- information "stored in an electronic or other medium."  Black's Law Dictionary 1465 (10th ed. 2014).

The Court concludes the Requested Records are plainly "records" for the purposes of Section 8(i), including information in electronic form.  Defendant's implicit argument that "records" are limited to physical materials is inconsistent with the common definitions of records, and specifically is contradicted by the Black's Law

Dictionary definition.[25]  The Court also disagrees with Defendant's characterization of Plaintiff's Requested Records residing on the Database as a request for "data formatted in a manner of Plaintiff's choosing," which Defendant maintains falls outside the definition of a record.  ([18] at 19).  Plaintiff, however, does not seek the Requested Records in any particular format.  (See [33] at 13-14).  That Defendant may, due to the manner in which the Requested Records are stored, experience technical burdens in making the records available, does not change that the Requested Records are preserved accounts of information or evidence of past events.

The context of Section 8(i) also supports the conclusion that "records" include the electronic Requested Records.  For instance, Section 8(i) uses the word "all" as a modifier to the word "records," suggesting an "expansive meaning because 'all' is a term of great breadth."  Project Vote/Voting for Am., Inc. v. Long, 682 F.3d 331, 336 (4th Cir. 2012) (internal quotation marks omitted) (quoting Nat'l Coal. for Students with Disabilities Educ. & Legal Def.

---

[25]    If Congress wanted to exclude electronic materials from the disclosure requirements of Section 8(i), it could have done so.  The Court is not permitted to insert limiting language, such as "physical" or "non-electronic," into the statute. See Mamani v. Berzain, 825 F.3d 1304, 1310 (11th Cir. 2016) ("[W]e are not allowed to add or subtract words from a statute." (quoting Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1334 (11th Cir. 2013)).

Fund v. Allen, 152 F.3d 283, 290 (4th Cir. 1998)).  Interpreting "records" to

exclude information contained within electronic databases also would allow States

to circumvent their NVRA disclosure obligations simply by choosing to store

information in a particular manner.  Given the ubiquity and ease of electronic

storage, this would effectively render Section 8(i) a nullity.  See United States

v. Irey, 612 F.3d 1160, 1221 n.42 (11th Cir. 2010) (en banc) ("[W]e will not

interpret the statute in a way that effectively renders it a nullity[.]"); see also

Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982) ("[I]nterpretations

of a statute which would produce absurd results are to be avoided if alternative

interpretations consistent with the legislative purpose are available.").  The fact

is that, in today's age, past events and the preservation of past facts are more often

stored electronically rather than in hard copy documents.  This is especially true of

large collections of information.

Defendant's narrow interpretation of "records"—which would reduce the

scope of information available to the public—also is inconsistent with the statutory

purposes of the NVRA, which include "protect[ing] the integrity of the electoral

process" and "ensur[ing] that accurate and current voter registration rolls are

maintained."  52 U.S.C. § 20501(b); see Miljkovic v. Shafritz & Dinkin, P.A.,

791 F.3d 1291, 1303 (11th Cir. 2015) ("A statute should be interpreted so as to

effect its purpose." (internal quotation marks omitted) (quoting Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952))).  Public access to a broad scope of information that shows how a State makes voter eligibility determinations furthers these goals.  The Court finds the Requested Records are "records" under Section 8(i).[26, 27]

2.   "Implementation of Programs and Activities"

Section 8(i) requires disclosure of only those records that "concern[] the implementation of programs and activities" to ensure the accurate and current

---

[26]   Defendant also argues that electronic materials are not records because Section 8(i) requires records to be "maintain[ed] for at least 2 years," which Defendant appears to interpret to mean that records are physical "documents that can be destroyed after two years."  ([18] at 19; [20.1] at 16).  The NVRA, however, does not address the destruction of documents and, even if it did, electronic data can be deleted and discarded just as paper documents can be shredded.  Defendant argues that "records" has a limited meaning because Section 8(i) requires records to be made available for "photocopying."  This misreads the statute, which requires public inspection of all records but requires photocopying only "where available," again suggesting that "records" are not limited to physical documents that can be photocopied.

[27]   Defendant, at times, appears to broaden his definition of "records" to include "documents or files capable of being copied, or a digital file capable of printing and copying."  ([20.1] at 16).  Setting aside whether this definition is supported by the text of the statute—and the Court finds it does not—Defendant's own definition appears to include the Requested Records contained within the Database.  Defendant's Rule 30(b)(6) deponent, S. Merritt Beaver, testified that a user of the Database could take screenshots of each individual record stored on the Database.  (See Beaver Dep. at 130:19-131:3).  These screenshots functionally serve as "digital file[s] capable of printing and copying" under Defendant's definition of records.  ([20.1] at 16).

33

official lists of eligible voters.  52 U.S.C. § 20507(i)(1).  There is a significant

dispute between the parties over the meaning of this requirement.  That meaning is

the principal interpretation issue in this case.  Although the parties frame their

arguments differently, the Court finds the central question is whether Section 8(i)

requires disclosure of records pertaining to individual applicants.[28]

a)      <u>Common and Ordinary Meaning of Terms</u>

The Court begins with the common and ordinary meaning of the terms

"concern," "implementation," "programs," and "activities."  The word "concern" is

a broad term meaning:

- "to relate or refer to," to "be about," or "to have an influence on." <u>Webster's Third New International Dictionary</u> 470 (2002);

- "to relate to; be connected with; be of interest or important to; affect." <u>Webster's Encyclopedic Unabridged Dictionary</u> 423 (2001).

- "to refer or relate to; to be about." <u>Oxford English Dictionary</u>, available at http://www.oed.com.

To "implement" means:

---

[28]      During the period before this action was filed, Defendant voluntarily produced records to Plaintiff while the parties were in less adversarial postures.  To the extent, if any, that applicant-specific information was disclosed, this fact is not controlling on the Court's interpretation or the legal requirements of Section 8(i), although the disclosure may be considered in evaluating what remedy, if any, to provide.

34

- to "carry out," "esp[ecially] to give practical effect to and ensure of actual fulfillment by concrete measures." <u>Webster's Third New International Dictionary</u> 1134 (2002);

- "to fulfill; perform; carry out," or "to put into effect according to or by means of a definite plan or procedure." <u>Webster's Encyclopedic Unabridged Dictionary</u> 961 (2001);

- to "complete, perform, carry into effect." <u>Oxford English Dictionary</u>, available at http://www.oed.com.

A "program" is:

- "a schedule or system under which action may be taken towards a desired goal." <u>Webster's Third New International Dictionary</u> 1812 (2002);

- "a plan of action to accomplish a specified end" or "a plan or schedule of activities, procedures, etc., to be followed." <u>Webster's Encyclopedic Unabridged Dictionary</u> 1546 (2001);

- "a plan or scheme of any intended proceedings." <u>Oxford English Dictionary</u>, available at http://www.oed.com.

An "activity" is:

- a "natural or normal function or operation." <u>Webster's Third New International Dictionary</u> 22 (2002);

- "a specific deed, action, function, or sphere or action." <u>Webster's Encyclopedic Unabridged Dictionary of the English Language</u> 20 (2001);

- "[a] project, task, or exercise" <u>Oxford English Dictionary</u>, available at http://www.oed.com.

Records under Section 8(i) thus must relate to fulfilling, performing, carrying out, or putting into effect by means of a definite plan or procedure (1) systems or

(2) specific actions to ensure that the State's official list of individuals entitled to vote is current and accurate.

The Requested Records generally concern the State's evaluation and processing of voter registration applications to determine whether applicants should be added to the voter rolls.  The process of reviewing and determining the eligibility of voter registration applications is a "program" because it is systematically carried out in service of a specified end—maintenance of the voter rolls—and it is an "activity" because it is a specific action or function undertaken by the county registrars.  See Long, 682 F.3d at 335 ("[T]he process of reviewing voter registration applications is a 'program' and 'activity.'").

The specific question is what purpose the word "implementation" has in the Section 8(i) phrase "implementation of programs and activities."  Depending on the interpretation of "implement," the Requested Records may or may not fall under the common and ordinary meaning of Section 8(i).  Under one interpretation, the records required to be disclosed under Section 8(i) are those that relate to the "procedures" a State "put into effect" to ensure the accuracy and currency of official lists of eligible voters.  See Webster's Encyclopedic Unabridged Dictionary 961 (2001).  In other words, the records must relate to the processes a State has in place, rather than how it processed any particular voter application.

36

Under another interpretation, disclosure of records that concern the "carrying out" or "performance" of any process or specific act to ensure the accuracy and currency of official lists of eligible voters is required.  See Webster's Third International Dictionary 1134 (2002).  This interpretation encompasses records pertaining to specific voter applicants, because the processing of an individual application is an act carried out to determine voter eligibility.  To determine which of these meanings applies, the Court next considers the language in the context of the NVRA as a whole.

b)    <u>Interpretation Context</u>

Congress passed the NVRA after finding that "discriminatory and unfair registration laws and *procedures* can have a direct and damaging effect on voter participation . . . ."  52 U.S.C. § 20501(a)(3) (emphasis added).  Courts interpreting the NVRA have found that its "primary emphasis" is to "simplify the *methods* for registering to vote in federal elections and maximize such opportunities for a state's every citizen."  <u>Louisiana</u>, 2016 WL 4055648, at *7 (emphasis added) (citing <u>Colon-Marrero</u>, 813 F.3d at 9 n.13).  If Congress intended a broad disclosure requirement encompassing information more granular than process information, it is unclear why it chose to include the word "implementation" at all. See <u>Lowery v. Ala. Power Co.</u>, 483 F.3d 1184, 1204 (11th Cir. 2007) ("[W]e must

37

construe [a] statute to give effect, if possible, to every word and clause."). Without the word, the provision would be broader, requiring disclosure simply of "all records relating to programs and activities . . . ." It is thus reasonable to interpret "implementation" as restricting the scope of the records required to be disclosed. Interpreting Section 8(i) to require disclosure of records relating to the processes a State implements to fulfill its NVRA obligations is in harmony with this statutory context.

Other context, however, can be read to support that Section 8(i) requires disclosure of individual applicant information. Paragraph 2 of Section 8(i) specifies that "[t]he records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." 52 U.S.C. § 20507(i)(2). By its terms, this paragraph includes a compilation of information along with information specific to the individuals included in the compiled list. The word "include" itself means "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate." Webster's Third New International Dictionary 1143 (2002). Paragraph 2 specifically notes the "records maintained pursuant to paragraph (1) *shall include*"

certain names and addresses, supporting that the records required to be disclosed in paragraph (1) encompass information regarding individual voter applicants.  See P.C. Pfeiffer Co., Inc. v. Ford, 444 U.S. 69, 77 n.7 (1979) ("We understand the word 'including' to indicate that 'longshoring operations' are a part of the larger group of activities that make up 'maritime employment.'"); Long, 682 F.3d at 337 ("Courts have repeatedly indicated that 'shall include' is not equivalent to 'limited to.'" (citing Nat'l Fed'n of the Blind v. FTC, 420 F.3d 331, 338 (4th Cir. 2005))). If Congress intended paragraph (2) to be read exclusively rather than inclusively, it seems Congress would have included different words such as "in addition to" or "also."

The exceptions to the broad "all records" disclosure requirement in Section 8(i) also support that Section 8(i) requires disclosure of individual applicant information.  Section 8(i) provides that disclosure is not required for records that relate to:  (1) "a declination to register to vote" or (2) "the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1).  The second exception is straightforward:  a disclosure of where a particular applicant submitted a voter registration form—for instance, whether the form was submitted to a State office providing assistance to the poor or at a DMV—might disclose information about an applicant that is stigmatizing or

might otherwise adversely reflect upon a particular applicant.[29]  It thus can be

argued that if Section 8(i) does not require disclosure of individual applicant

records, the NVRA would not prevent States from disclosing records that may

reveal the identity of the VRAs and the registration applicants they may serve.

This interpretation presupposes that Section 8(i) requires the disclosure of

individual applicant information.

   The first exception similarly presupposes that Section 8(i) requires

disclosure of individual applicant information.  The first exception bars disclosure

of records relating to a "declination to register to vote."  It is reasonable to read this

provision as barring information regarding an individual's personal decision not to

register to vote, including because other provisions of the NVRA relate to

processes and requirements with respect to an individual's choice whether to

register.  See, e.g., 52 U.S.C. § 20506(a)(6)(A)(ii), (a)(6)(B)(iii), (a)(7).  For

example, Section 7(a)(6)(C) provides that, if a VRA is an office that provides

service or assistance in addition to conducting voter registration, such as to

disabled persons, the VRA must "provide to *each applicant* who does not decline

---

[29]     Section 7 of the NVRA specifically defines a VRA, describes the duties of
each VRA, and requires states to designate as VRAs "all offices in the State that
provide public assistance" and "all offices in the State that provide State-funded
programs primarily engaged in providing services to persons with disabilities."
52 U.S.C. § 20506(a)(2).

to register to vote the same degree of assistance [in completing the registration form] as is provided by the office with regard to the completion of its own forms . . . ." Id. § 20506(a)(6)(C) (emphasis added).  Section 7(a)(7) provides that "[n]o information relating to a declination to register to vote in connection with *an application* made at an office described in paragraph (6) may be used for any purpose other than voter registration." Id. § 20506(a)(7) (emphasis added).  It is clear that Section 7(a)(7) intends to prevent information relating to any particular individual's declination to register to vote from being used for improper purposes.[30]  The same "declination to register to vote" language is found in the first exception to Section 8(i), and should be read, consistent with the Section 7 provisions, to refer to information regarding individual applicants' declinations to vote.  See Burlison, 455 F.3d at 1247 (repetition of a word "suggests that Congress intended that the word mean only one thing").

The exceptions to Section 8(i) presuppose that records required to be disclosed include records regarding individual voter applicants.[31]

---

[30]   Disclosure that a particular applicant decided not to register might cause that person to be targeted by registration advocacy groups.

[31]   The disclosure of applicant-specific information raises the separate issue of the extent to which personal information about applicants is required to be disclosed.  The Court addresses this personal privacy issue later.

c)      <u>Statutory Purposes</u>

Congress enacted the NVRA to "increase the number of eligible citizens who register to vote" in Federal elections, "enhance[] the participation of eligible citizens as voters," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b).  These provisions show that the NVRA was "designed to ensure that eligible applicants in fact are registered and that ineligible registrants are removed from the States' official voter lists."  <u>True the Vote</u>, 43 F. Supp. 3d at 721. Limiting the disclosure requirement to a set of general process implementation records without the production of records to show the results of the processes and activities put into place would hinder the public's ability to "protect the integrity of the electoral process" and to ensure voting regulation programs and activities are implemented in a way that accomplishes the purposes of the statute and are not executed in a manner that is "discriminatory and unfair."  <u>See</u> 52 U.S.C. § 20501.

d)      <u>Legislative History</u>

Where there is an ambiguity regarding the meaning of a statute, the statute's legislative history may be consulted to address the ambiguity.  While there is no ambiguity here, even if there was, the scant legislative history relevant to Section 8(i) that the parties identify, and that the Court has been able to locate, supports

42

that specific application information falls within the Section 8(i) disclosure

requirement.  Senate Report No. 103-6 states, with respect to Section 8(i):

> Provisions of this Act pertaining to voter registration programs require
> that information regarding *a person's declination to register* not be
> used for any purpose other than registration.  There was also concern
> that information not be made public as to *what voters registered at a
> particularly agency*, such as a welfare or unemployment office.
> Therefore, these records may not contain any information relating to a
> declination to register or the identity of a voter registration agency
> through which any particular voter is registered, *or a list of those
> persons registered through a particular agency*.

S. Rep. No. 103-6, at 35 (1993) (emphasis added).  That Congress, in drafting the

exceptions to the disclosure requirements in Section 8(i), expressed some concern

that information about "a person's declination to register" and "what voters

registered at a particular agency" not be made public supports the Court's reading

of the exceptions, and supports that the exceptions anticipated that Section 8(i)

requires the disclosure of information about individual voter applicants.

The Court concludes that, in addition to requiring records regarding the

processes a state implements to ensure the accuracy and currency of voter rolls,

considering the NVRA as a consistent whole, individual applicant records are

encompassed by the Section 8(i) disclosure requirements.[32]

---

[32]    Defendant argues that Section 8(i) does not require disclosure of the
Requested Records because the provision is limited to information about, as

3.      Applying the Requirements of Section 8(i) to the Requested Records

The Court next applies this interpretation of Section 8(i) to Plaintiff's

Requested Records.  The Requested Records are:

(1)     The date voter registration applications were signed by an applicant.

(2)     The date applications were entered into the Database.

(3)     Each change in an applicant's voter registration status.

(4)     The creation date of Database-generated letters to applicants.

(5)     Whether an election official manually, instead of mechanically, changed the status of one or more applicants.

(6)     Reasons other than the most recent reason why an applicant was rejected, canceled, or otherwise not added to the voter roll.

---

Defendant characterizes it, "list maintenance processes" for current or previously-registered voters.  (See [18] at 17-19 ("[T]he disclosure provision was intended to provide transparency in the removal of voters from registration lists . . . ."); [20.1] at 14-15, 18-21).  The plain language of the statute does not limit the disclosure requirement in the manner Defendant suggests.  The Court's analysis of the common and ordinary meaning of the provisions of the NVRA supports that Section 8(i) requires disclosure of records concerning both unregistered applicants and registered voters.  See Long, 682 F.3d at 335-36 (rejecting argument that Section 8(i) does not encompass rejected voter applications); Long, 752 F. Supp. 2d at 705-706 (same); see also True the Vote, 43 F. Supp. 3d at 723 (finding Mississippi's Voter Roll, which includes information regarding active, inactive, pending, purged, and rejected voters, is a record required to be disclosed under Section 8(i)).

(7)  The specific reason why applicants, assigned a status reason of "Error," "Hearing," or "Reject," were canceled.

(8)  Records reflecting applicants' telephone numbers, if listed on their applications.

(9)  Records for canceled applicants with a status reason other than one of the eleven options in the drop-down menu in the Database.

(10)  Copies of Database-generated letters sent to applicants.

(11)  Records reflecting the date a voter registration application was received by election officials.

(12)  The date and disposition of, and any response to, all letters sent to applicants.

(13)  Copies of letters, not generated by the Database, that were sent to applicants.

Plaintiff contends each of these categories of records "relate to Defendant's process of determining whether voter registration applicants are eligible to be added to the voter roll, and in particular the reasons such voters are not added or removed from the voter roll."  ([33] at 2).  There are, however, certain categories of Requested Records that Plaintiff has not shown are related to the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of voter rolls.  This showing has not been made for these categories even though Plaintiff was allowed to conduct a Rule 30(b)(6) deposition of the person knowledgeable about the Database and information in it.

The list also includes records the disclosure of which would violate the privacy interests of applicants.  Against this backdrop, the Court considers the Requested Records categories.

With respect to categories (1) through (7), Mr. Beaver testified these records are stored in one or more of the Database's audit tables.  (See Beaver Dep. at 79:25-80:6; 81:25-82:4; 89:23-90:5; 92:12-25; 95:1-96:1; 89:18-22; 123:25-124:5; 26:2-12, 89:23-90:5; 56:13-57:5[33]).  Plaintiff contends these categories "concern the processing of voter registration applicants and are central to Defendant's maintenance of an accurate and updated voter roll."  ([33] at 8).  Regarding Category (1), Mr. Beaver testified that signature date on voter registration applications is relevant to the processing of applications because an individual "could send multiple paper applications in . . . [so t]he date that's signed on an application is recorded."  (See Beaver Dep. at 79:21-80:1).  Mr. Beaver testified that Category (2), the date the applications were entered into the Database, is "part of the audit history" of the Database.  (Beaver Dep. at 81:17-21).  These two Categories of records thus concern the processing of applications.

---

[33]     Mr. Beaver did not specify the exact location in the Database of the "comment box" that could potentially contain specific reasons for cancelation of voters or applicants assigned to a status of "Canceled" and a status reason of "Error," "Hearing," or "Reject."

With respect to Category (4), the Court finds that the creation date of Database-generated letters to applicants falls under Section 8(i) only if those letters concern the status or completeness of an individual's application or otherwise relate to the evaluation of an individual's eligibility to vote.[34]

With respect to Categories (5) and (7), those records, on their face, concern the State's processing of voter registration applicants to the extent the records are maintained on the Database.  Categories (3) and (6) also fall under Section 8(i).

With respect to categories (8) through (10), Mr. Beaver testified these records also are stored on the Database.  (See Beaver Dep. at 81:12-15; 67:7-68:4; 69:11-17; 93:24-94:1).  Category (8) seeks records reflecting applicants' and voters' telephone numbers, if provided on their applications.  There currently is nothing in the record to show that any telephone number information is relevant or necessary to consideration of voter eligibility.  The Court finds there is insufficient information at this time to find that telephone numbers fall under the disclosure requirement of Section 8(i).  Category (9), on the other hand, seeks records that, on their face, are relevant to activities carried out to determine voter eligibility. Category (10), similar to Category (4), falls under Section 8(i) only to the extent

---

[34] For instance, a letter sent to an individual indicating his or her proper voting location is not an action carried out to ensure the accuracy or currency of voter rolls.

the letters concern the status or completeness of an individual's application or otherwise relate to the evaluation of an individual's eligibility to vote.

Plaintiff contends, with respect to Categories (11) through (13), that "Defendant has not confirmed whether these records are stored in another location and could be made available, even though Federal law mandates that they be maintained for at least two years." ([33] at 10). Plaintiff's argument presupposes that the "records" requested in Category (11) ever existed in the first place—that is, that information regarding the date a voter registration application was received by election officials was ever preserved in a written account. Mr. Beaver testified that such information is not recorded. (Beaver Dep. at 80:7-15). Plaintiff implicitly argues, without any legal support or reasoning, that Section 8(i) mandates that Defendant must *create* such a record by documenting the information.[35] Even if such a record ever existed, it is not clear at this point whether information pertaining to the date a voter registration application was received has anything to do with the processing of a voter application to determine

---

[35]    Whether a record is required to be maintained is different from a claim that a maintained record is required to be disclosed. The question whether Defendant failed to maintain one or more records is not presently before the Court.

voter eligibility.[36]  As to Categories (12) and (13), letters sent to applicants,

whether Database-generated or otherwise, fall under Section 8(i) to the extent the

letters concern the status or completeness of an individual's application or

otherwise relate to the evaluation of an individual's eligibility to vote.  The Court

notes that Plaintiff's Category (12) request for records reflecting the "disposition"

of letters or notices sent to applicants is ambiguous.  Without more information,

the Court is unable to determine whether this "disposition" information is required

to be disclosed under Section 8(i).

The Court finds that Categories (8), (11), and the Category (12) request for

records reflecting the "disposition" of letters or notices sent to applicants do not

appear, at this time, to fall under the disclosure requirements of Section 8(i).  The

remainder of the Categories, as modified above, fall under Section 8(i), and the

Court refers to these records, which are required to be disclosed, as the "Section

8(i) Records."

Having determined that the Section 8(i) Records are subject to disclosure,

the Court considers the scope of the disclosure required and specifically whether

personal information may be redacted to preserve applicant privacy.

---

[36]     It is possible the date an application was received is relevant to determining
whether the application was timely filed.  The record does not show whether this is
the case.

4.    <u>Redactions to Applicant Information</u>

Though the Section 8(i) Records do not explicitly seek sensitive private information about an applicant, such as Social Security numbers or birth dates, it is certain that such information is contained in the records sought.  Section 8(i) requires the disclosure of individual voter registration records, but it does not require the disclosure of sensitive information that implicates special privacy concerns.  <u>See</u> <u>True the Vote</u>, 43 F. Supp. 3d at 733-39 (noting distinction between making a record available and redacting discrete confidential information contained within a given record, and concluding that the "NVRA does not require disclosure of unredacted documents").  This conclusion is supported by the text and purposes of the NVRA, and privacy considerations found in Federal and State laws.

Paragraph 2 of Section 8(i) specifies that "[t]he records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made."  52 U.S.C. § 20507(i)(2).  That Congress specifically required disclosure only of the names and addresses of this category of

applicants suggests other types of information may be protected from Section 8(i)'s disclosure requirement.

Other Federal statutes generally recognize the confidentiality of certain voter information.  As the <u>True the Vote</u> court observed, the Civil Rights Act of 1960, 42 U.S.C. § 1974, requires State elections officers to preserve "all records and papers which come into [their] possession relating to any application, registration . . . or other act requisite to voting in such election."  43 F. Supp. 3d at 734 (emphasis omitted) (quoting 42 U.S.C. § 1974[37]).  "Congress authorized only the Attorney General to inspect these documents, but even he may not disclose any record except to Congress, other government agencies, or in a court proceeding or when otherwise ordered to do so by a court."  <u>Id.</u> at 734-35 (citing 42 U.S.C. §§ 1974b, 1974c[38]).  If redaction of certain sensitive information is not permitted, Section 8(i) would effectively provide any individual unfettered access to sensitive information the Civil Rights Act of 1960 prevents even the Attorney General from disclosing.  Allowing disclosure of unredacted voter applications is inconsistent also with Congress's concern for individual privacy evidenced in Federal statutes,

---

[37]    On September 1, 2014, 42 U.S.C. § 1974 was recodified as 52 U.S.C. § 20701.

[38]    On September 1, 2014, 42 U.S.C. §§ 1974b and 1974c were recodified as 52 U.S.C. §§ 20703 and 20704, respectively.

including statutes such as the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq.,
the Freedom of Information Act, 5 U.S.C. § 552 et seq., and the Privacy Act of
1974, 5 U.S.C. § 552a et seq.

Despite the general presumption that judicial records are public documents,
see Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978); Chicago Tribune
Co. v. Bridgestone/Firestone, 263 F.3d 1304, 1311 (11th Cir. 2001), the Federal
Rules of Civil Procedure also express a preference for the privacy of personal
information about individuals by allowing redaction of social security numbers, an
individual's birth year, a minor's full name, and financial account and
taxpayer-identification numbers.  Fed. R. Civ. P. 5.2(a).[39]

Similar privacy principles are embodied in Georgia law, which exempts
from disclosure "[r]ecords that reveal an individual's social security number,
mother's birth name, . . . unlisted telephone number if so designated in a public
record, personal e-mail address or cellular telephone number, [and] day and month
of birth . . . ."  O.C.G.A. § 50-18-72(20)(A); accord Cal. Gov't Code § 6254.4;
5 Ill. Comp. Stat. 140/7(1)(c); Tex. Gov't Code § 552.102(a).  Disclosure of
sensitive information such as Social Security numbers also is contrary to the

---

[39]     These types of redactions protect personal information and also protect
against personal violations such as identity theft.

purpose of the NVRA to "increase the number of eligible citizens who register to vote," 52 U.S.C. § 20501(b), because an individual could be deterred from registering if his confidential information were subject to public disclosure.

The Court concludes that it is illogical that in enacting the NVRA, Congress intended to erode Federal and State law protecting against the disclosure of private, personal information.  See True the Vote, 43 F. Supp. 3d at 735.  That Congress intended to limit certain confidential information from disclosure has been recognized by every court that has considered Section 8(i).  See Long, 682 F.3d at 339 (Social Security numbers constitute "uniquely sensitive" information required to be redacted); Long, 752 F. Supp. 2d at 711-12 (same); see also True the Vote, 43 F. Supp. 3d at 734 (telephone numbers and Social Security numbers must be redacted).

The Court determines that the Section 8(i) Records required to be disclosed must have redacted from them the following personal information:

- All but the final four digits of an applicant's telephone number;

- All but the final four digits of an applicant's Social Security number;

- All characters preceding the @ symbol in an applicant's email address; and

- An applicant's birth date.[40]

With the exception of applicants' telephone numbers, Plaintiff does not seek these categories of information. The information also is not relevant to the purposes for which Plaintiff seeks the Section 8(i) Records—to determine whether the State improperly removed or did not add individuals to the voter roll. As explained above, the Court is unaware of any information in the record reflecting that telephone numbers fall under the disclosure requirement of Section 8(i).[41] Even if it were, all but the last four digits of a telephone number would be required to be redacted.

---

[40] Though a birth date may be relevant to whether a particular applicant is eligible to vote, the history of this action and Plaintiff's requests of Defendant do not reveal that Plaintiff seeks records to evaluate whether Defendant rejected applications on the basis of age. Plaintiff's requests do not seek this specific information. The Court also finds birth dates are uniquely sensitive, particularly in combination with a full name and address. See True the Vote, 43 F. Supp. 3d at 736-37 (noting that birthdates, in combination with other data, can reveal Social Security numbers and other highly sensitive information).

[41] The Court does not need to determine in this Order whether applicant names and addresses are required to be redacted, because Defendant voluntarily provided this information to Plaintiff previously. (See [18] at 8). The disclosure of names and addresses of applicants raises privacy issues and issues concerning the appropriate use of records required to be disclosed under the NVRA, including the use of personal information about applicants to engage in partisan efforts to target applicants for registration.

The Court next turns to the remaining issues raised in Defendant's Motion to Dismiss and Plaintiff's Preliminary Injunction Motion.

## III.   MOTION TO DISMISS

### A.   Legal Standard

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences." Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010). Although reasonable inferences are made in the plaintiff's favor, "'unwarranted deductions of fact' are not admitted as true." Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting S. Fla. Water Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (11th Cir. 1996)). Similarly, the Court is not required to accept conclusory allegations and legal conclusions as true. See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (construing Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Mere "labels and

conclusions" are insufficient.  Twombly, 550 U.S. at 555.  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."

Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  This requires more than

the "mere possibility of misconduct." Am. Dental, 605 F.3d at 1290 (quoting

Iqbal, 556 U.S. at 679).  The well-pled allegations must "nudge[] their claims

across the line from conceivable to plausible."  Id. at 1289 (quoting Twombly,

550 U.S. at 570).  The Court applies this standard to consider Defendant's

arguments to dismiss.

>    B.    Analysis

In addition to his arguments based on the terms of the NVRA, that are

discussed above, and which the Court finds are not grounds to dismiss Plaintiff's

claims, Defendant also argues that the Help America Vote Act of 2002 ("HAVA"),

52 U.S.C. § 21083 et seq., precludes disclosure of records that are resident on the

Database, and that Plaintiff failed to provide the required statutory notice to

Defendant for certain of its requests.

>    1.    Whether the HAVA Implicitly Repealed Section 8(i)

Defendant argues that the HAVA prohibits disclosure of records resident on

the Database, because the statute requires state election officials to prevent

unauthorized access to state voter registration databases.  Because the Section 8(i) Records within the Database are records subject to disclosure, to accept Defendant's argument, the Court would have to find that the HAVA impliedly repealed a portion of Section 8(i).  Implicit repeal requires "a positive repugnancy . . . that cannot be reconciled."  Tug Allie-B, Inc. v. United States, 273 F.3d 936, 941 (11th Cir. 2001).  "If any interpretation permits both statutes to stand, the court must adopt that interpretation, 'absent a clearly expressed congressional intention to the contrary.'"  Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs, 619 F.3d 1289, 1299 (11th Cir. 2010) (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006)).

Defendant bases his implied repeal argument on Section 303 of the HAVA, which provides that States "shall provide adequate technological security measures to prevent the unauthorized access to the computerized list" of voters required to be maintained under the HAVA.  52 U.S.C. § 21083(a)(3).  This provision can be read in harmony with the NVRA:  while the HAVA requires States to implement technological security measures to prevent *unauthorized* access to the Database—through, for example, hacking or online attacks—the NVRA *authorizes* the State to disclose relevant Database records in response to a Section 8(i) request.  In other words, NVRA disclosure is not "unauthorized" access because it is specifically

required.  Indeed, this interpretation is required because the HAVA expressly provides that "nothing in this [Act] may be construed to . . . supersede, restrict, or limit the application of [the NVRA]."  52 U.S.C. § 21145(a)(4); see also Long, 682 F.3d at 338 ("[B]y its own terms, HAVA cannot restrict or limit the application of the NVRA's public disclosure requirement.").  The HAVA does not prohibit disclosure of information contained in the Database where that disclosure is required under the NVRA.

### 2.    NVRA Notice Requirement

Defendant next argues Plaintiff's Complaint should be dismissed because Plaintiff failed to provide the required statutory notice to Defendant for certain of its requests.  The NVRA provides that an "aggrieved" person "may provide written notice of the violation to the chief election official of the State involved."  52 U.S.C. § 20510(b)(1).  "Although notice is framed . . . as permissive rather than mandatory, other NVRA provisions indicate that notice is mandatory."  Scott v. Schedler, 771 F.3d 831, 835 (5th Cir. 2014).  For instance, the NVRA provides that, "[i]f the violation is not corrected within 90 days after receipt of [the] notice . . . the aggrieved person may bring a civil action . . . ."  52 U.S.C. § 20510(b)(2).  "No standing is therefore conferred if no proper notice is given, since the 90-day period never runs."  Scott, 771 F.3d at 835 (quoting Ga. State

Conference of NAACP v. Kemp, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012)).

"The apparent purpose of the notice provision is to allow those violating the

NVRA the opportunity to attempt compliance with its mandates before facing

litigation."  Kemp, 841 F. Supp. 2d at 1335 (citing Ass'n of Cmty. Orgs. for

Reform Now v. Miller, 129 F.3d 833, 838 (6th Cir. 1997)).

Defendant argues that "Plaintiff has consistently sought access to

Defendant's [D]atabase . . . .  However, to the extent that Plaintiff suggests that

what it really seeks in this litigation is copies of documents maintained by election

officials, Plaintiff has not provided Defendant with statutory notice . . . ."  ([20.1]

at 21-22).  Defendant also argues that, to the extent Plaintiff now requests

individual voter records, it failed to provide statutory notice.  ([37] at 14).  The

contents of Plaintiff's July 6, 2015, NVRA Notice, sent to Defendant nearly a year

before this action was filed, make it clear that Plaintiff sought a wide variety of

records.  The NVRA Notice described the records Plaintiff requested on

October 30, 2014, and sought to explain why Defendant's productions failed to

satisfy those requests.  Plaintiff stated that Defendant did not provide (1) a

complete list of rejected or canceled applicants, (2) records for applicants not

added to the voter roll for reasons other than cancelation or rejection, (3) materials

adequately explaining Defendant's data codes or the specific reason an applicant

was canceled, rejected or otherwise not added to the voter roll, (4) a copy of the Database,[42] and (5) all written policies, manuals or other guidance regarding the processing of voter registration applications.  ([1.13] at 3-7).  The NVRA Notice stated that Plaintiff seeks "any records explaining or reflecting the reasons for [an applicant's or voter's] rejection, cancelation, or not being added" to the voter roll.  (Id. at 2).

The Court finds Plaintiff's NVRA Notice, which clearly articulated its concerns and stated it sought "any records" pertaining to its concerns, met the notice requirement of 52 U.S.C. § 20510(b)(1).  Defendant does not provide any support for its position that Plaintiff was required to detail in its written notice the format of the documents it sought, or the specific type of documents that would satisfy its request.  Indeed, courts have found that an NVRA notice is sufficient if it "sets forth the reasons for [the] conclusion" that a defendant failed to comply with the NVRA, and, when "read as a whole, [it] makes it clear that [the plaintiff] is asserting a violation of the NVRA and plans to initiate litigation if its concerns are not addressed in a timely manner."  Judicial Watch, Inc. v. King, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012).  This interpretation is consistent with the purpose of the

---

[42]     The Requested Records, unlike the NVRA Demand, do not seek a copy of the Database.

notice provision, which "is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." Kemp, 841 F. Supp. 2d at 1335.  Plaintiff's NVRA Notice met the requirements of 52 U.S.C. § 20510(b)(1).  For the reasons stated in this Order, Defendant's Motion to Dismiss is denied.[43]

## IV.   PRELIMINARY INJUNCTION MOTION

Plaintiff seeks a preliminary injunction requiring Defendant to disclose the Requested Records.  Because the Court has determined certain of the Requested Records are not, at this time, subject to disclosure under Section 8(i), the Court considers the Preliminary Injunction Motion as seeking disclosure only of the Section 8(i) Records.

### A.   Legal Standard

A plaintiff seeking a preliminary injunction must establish:  (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the

---

[43]   In its August 29, 2016, reply brief in support of its Preliminary Injunction Motion [33], Plaintiff asserts that the parties dispute whether the burden of making the Requested Records available is a valid reason to excuse compliance with the NVRA.  ([33] at 10).  To the extent Defendant seeks to argue that the burden of compliance is a ground to dismiss the Complaint, Defendant does not present legal support for his argument, and the Court does not find any support for it in the text of the NVRA.  The Court will consider the burden of compliance in its analysis of Plaintiff's Preliminary Injunction Motion.

absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites.  The burden of persuasion in all of the four requirements is at all times upon the plaintiff."  Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990) (internal quotation marks omitted) (quoting United States v. Jefferson County, 720 F.2d 1511, 1519 (11th Cir. 1983)); see Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc., 188 F. Supp. 2d 1350, 1357 (S.D. Fla. 2002) ("Courts in this Circuit will not issue a preliminary injunction where the moving party fails to meet its burden of proof on each of the four factors.").

     B.    Analysis

        1.    Likelihood of Success on the Merits

A likelihood of success on the merits is generally considered the most important factor when considering whether to grant a preliminary injunction motion.  See Schiavo v. Schiavo, 357 F. Supp. 2d 1378, 1383 (M.D. Fla. 2005), aff'd, 403 F.3d 1223 (11th Cir. 2005).  The Court has determined the Section 8(i) Records are required to be disclosed under the NVRA.  Defendant admits that he

did not disclose the Section 8(i) Records.  (See [33] at 6-10 (citing Beaver Dep.)).

Defendant argues, however, that he substantially complied with Plaintiff's original

request for records, and "therefore Plaintiff's motion for injunctive relief is moot."

([18] at 12).  Mootness bars a lawsuit "when it is impossible for a court to grant

any effectual relief whatever to the prevailing party."  Knox v. Serv. Emps. Int'l

Union, Local 1000, 132 S. Ct. 2277, 2287 (2012).  The party asserting mootness

bears the "'formidable burden of showing that it is absolutely clear the allegedly

wrongful behavior could not reasonably be expected to recur.'"  Doe v. Wooten,

747 F.3d 1317, 1322 (11th Cir. 2014) (quoting Friends of the Earth, Inc.

v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000)).  Defendant's

substantial compliance with Plaintiff's records requests does not moot this action,

because it is possible for the Court to grant relief to Plaintiff—that is, to order

Defendant to make the Section 8(i) Records available.  Cf. N.L.R.B. v. Allied Med.

Transp., Inc., 805 F.3d 1000, 1006-1007 (11th Cir. 2015) (substantial compliance

with National Labor Relations Board order did not render the cause moot); Fla.

Democratic Party v. Hood, 342 F. Supp. 2d 1073, 1082 & n.10 (N.D. Fla. 2004)

(Florida's steps to remedy previous voting rights violations did not moot plaintiff's

claims).

63

Defendant admits that he did not disclose the Section 8(i) Records to Plaintiff.  (See [33] at 6-10 (citing Beaver Dep.)).  Defendant appears to argue that the burden of making available certain of the Requested Records excuses his compliance with the disclosure requirements of the NVRA.  Defendant does not present any legal support for his argument, and the Court does not find any support for it in the text of the NVRA.  The burden of making the records available is relevant, if at all, to whether Plaintiff meets its burden to show the balance of equities supports granting a preliminary injunction.  It is not relevant to whether Plaintiff has established its likelihood of success on the merits.  Because Defendant admits he has not fully made the Section 8(i) Records available to Plaintiff, the Court finds Plaintiff has met its burden to show it is likely to succeed on the merits of establishing a violation of the NVRA disclosure requirements.

## 2.   Irreparable Harm

Plaintiff contends that Defendant's refusal to disclose records will cause Plaintiff irreparable harm.  "An injury is 'irreparable' only if it cannot be undone through monetary remedies."  Charles H. Wesley Educ. Found., Inc., 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004) (quoting Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987)).

Plaintiff argues that inspection of the records before Georgia's

October 11, 2016, voter registration deadline is essential for Plaintiff to "exercise

the oversight functions envisioned by the NVRA and to ensure all of Georgia's

voters may exercise their right to vote in the upcoming election."  ([12.1] at 24).

Defendant argues that, although Plaintiff has had Defendant's list of canceled voter

applications since April, 2015, Plaintiff has yet to identify a single voter who was

improperly removed or not added to the voter rolls.  ([18] at 23-24).  Defendant's

argument overlooks that Plaintiff seeks the records to determine whether a voter

was or was not improperly removed or not added to the voter rolls.

This Court has recognized that conduct that limits an organization's ability

to conduct voter registration activities constitutes an irreparable injury.  See Ass'n

of Cmty. Orgs. for Reform Now v. Cox, No. 1:06-CV-1891-JTC, 2006 WL

6866680, at *7 (N.D. Ga. Sept. 28, 2006); Charles H. Wesley, 324 F. Supp. 2d at

1368 ("[N]o monetary remedy can correct the fact that the applications submitted

on June 12 were improperly rejected nor will a monetary remedy prevent the state

from rejecting similar applications in the future.").

The reasoning of Cox and Charles H. Wesley applies here.  The purpose of

the NVRA's disclosure provision is to allow the public to oversee voter

registration processes to "protect the integrity of the electoral process" and "ensure

that accurate and current voter registration rolls are maintained."  52 U.S.C.

§ 20501(b).  The Section 8(i) Records contain information about the State's

evaluation and processing of voter registration applications to determine whether

applicants should be added to the voter roll.  Plaintiff seeks the records in

furtherance of its mission "to ensure that voter registration applicants are properly

added and voters are not unlawfully removed from the list of eligible voters."

(Decl. of Brian W. Mellor [12.2] ¶ 4).  There is no monetary remedy that can

correct the public's lack of access to information enabling it to ensure the integrity

of Georgia's voter registration process.  See Charles H. Wesley, 324 F. Supp. 2d at

1368.  The Court finds Plaintiff meets its burden to show it will suffer irreparable

injury if a preliminary injunction is not granted.

> 3.    Balancing of the Harms or Equities

The third preliminary injunction factor requires the Court to consider the

extent to which the injunction will harm the non-movant.  Plaintiff argues the

balance of the equities favors granting preliminary relief, because Defendant's

refusal to make records available "undermines the NVRA's core purpose of

enabling oversight of election officials and protecting the voting rights of the

public."  ([12.1] at 22).  It argues the cost of disclosure under the NVRA "is a

burden that Congress assigned to states as part of the NVRA's statutory scheme."

(Id. at 23).  Defendant, in his briefing and through his Rule 30(b)(6) witness

S. Merritt Beaver, maintains he would suffer an undue burden if he were forced to

make available the Section 8(i) Records.[44]

The Court finds that the threatened injury to Plaintiff outweighs the harm to

Defendant.  The NVRA requires that Defendant maintain voter registration records

and make the records accessible for public inspection.  Defendant chose to contract

a third party to create the Database, and now claims that it is unduly burdensome to

fulfill his NVRA obligations to make available certain Section 8(i) Records that

are resident on the Database.  As Defendant admits, unlike other Federal statutes,

"the NVRA has no express language permitting a state agency to charge the

requestor the costs of producing whatever information is requested."  ([37] at 11).

The absence of a cost provision in the public inspection provision of the NVRA—

and its inclusion in other record disclosure laws—suggests Congress intended

States to shoulder the burden about which Defendant now complains.

As Plaintiff notes, Mr. Beaver testified that Defendant can provide the

Section 8(i) Records in several different formats.  For instance, Mr. Beaver

testified the records could be provided in a database format, similar to the Database

---

[44]    Though Defendant does not explicitly argue this point with respect to the
Preliminary Injunction Motion, the Court considers it here.

in which the records are now stored, as well as on an individual, as opposed to aggregated, basis.  (Beaver Dep. at 90:19-91:9, 130:20-131:16).  While Defendant maintains that providing the records in database format would be prohibitively expensive and may compromise Database security,[45] Defendant does not appear to provide any reason why he could not provide the records on an individual basis, arguing only that Plaintiff failed to provide statutory notice of its request for individual voter records.  (See [37] at 14).  The Court has rejected Defendant's statutory notice argument.  The Court finds the balance of equities tips in Plaintiff's favor where, as here, the design of the record system was selected by Defendant.

    4.   <u>Public Interest</u>

Finally, the Court finds an injunction would not be contrary to the public interest.  "The public has an interest in seeing that the State of Georgia complies with federal law, especially in the important area of voter registration.  Ordering the state to comply with a valid federal statute is most assuredly in the public

---

[45]    Mr. Beaver testified that to provide the records in the database format they are in currently would require the creation of an entirely new database, which is "usually [a] multi-million dollar exercise[]."  (Beaver Dep. at 90:19-91:9).  Mr. Beaver did not explain why an entirely new database would be required.  Defendant also argues, without any evidence to support, that copying the state election Database would compromise its security by making it more vulnerable to malicious intrusion.  ([37] at 13-14).

interest."  Charles H. Wesley, 324 F. Supp. 2d at 1369; see also Long, 682 F.3d at

339 ("It is self-evident that disclosure [of voter registration records] will assist the

identification of both error and fraud in the preparation and maintenance of voter

rolls."); Cox, 2006 WL 6866680, at *7 ("The public's interest is advanced by

registering as many eligible voters as possible.").  Preliminary relief that allows

Plaintiff, before the October 11, 2016, Georgia voter registration deadline, to

examine the Section 8(i) Records is in the public interest.  Because Plaintiff meets

its burden to show it is entitled to preliminary injunctive relief, Plaintiff's

Preliminary Injunction Motion is granted with respect to the Section 8(i) Records.

The motion is denied with respect to the remainder of the Requested Records.[46]

## V.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Brian Kemp's Motion to

Dismiss [20] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Project Vote, Inc.'s

Motion for Preliminary Injunction [12] is **GRANTED IN PART** and

**DENIED IN PART**.  Plaintiff's Motion is **GRANTED**, and Defendant

---

[46]    The interpretation of Section 8(i) in this Order is a matter of first impression
in our Circuit.  In view of the importance of the disclosure requirement, the Court
would be willing to entertain a motion to certify this matter for appeal.

shall, on or before October 7, 2016, disclose to Plaintiff the following

records with respect to canceled, rejected, or pending applicants: [47]

(1)     The date voter registration applications were signed by an applicant.

(2)     The date applications were entered into the Database.

(3)     Each change in an applicant's voter registration status.

(4)     The creation date of Database-generated letters to applicants, only to the extent the letters concern the status or completeness of an individual's application or otherwise relate to the evaluation of an individual's eligibility to vote.

(5)     Whether an election official manually, instead of mechanically, changed the status of one or more applicants, only to the extent these records are stored on the Database.

(6)     Reasons other than the most recent reason why an applicant was rejected, canceled, or otherwise not added to the voter roll.

(7)     The specific reason why applicants, assigned a status reason of "Error," "Hearing," or "Reject," were canceled, only to the extent these records are stored on the Database.

(8)     Records for canceled applicants with a status reason other than one of the eleven options in the drop-down menu in the Database.

(9)     Copies of Database-generated letters sent to applicants, only to the extent the letters concern the status or completeness of an

---

[47]     Defendant should make reasonable efforts to produce the records as they are processed.  If there is any problem in completing the production of the Section 8(i) Records by October 7, 2016, the Court should be advised immediately.

individual's application or otherwise relate to the evaluation of an individual's eligibility to vote.

(10)　The date of, and any response to, all letters sent to applicants, only to the extent the letters concern the status or completeness of an individual's application or otherwise relate to the evaluation of an individual's eligibility to vote.

(11)　Copies of letters, not generated by the Database, that were sent to applicants, only to the extent the letters concern the status or completeness of an individual's application or otherwise relate to the evaluation of an individual's eligibility to vote.

The records disclosed must have redacted from them the following personal information:

- All but the final four digits of an applicant's telephone number;

- All but the final four digits of an applicant's Social Security number;

- All characters preceding the @ symbol in an applicant's email address; and

- An applicant's birth date.

Plaintiff's Motion for Preliminary Injunction is **DENIED** with respect to the remainder of the Requested Records.

71

**SO ORDERED** this 19th day of September, 2016.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE